**In re EQUITY FUNDING CORPORATION OF AMERICA SECURITIES LITIGATION.**

No. 142.

Judicial Panel on Multidistrict Litigation.

Dec. 11, 1973.

Opinion Feb. 1, 1974.

Concurring and Dissenting Opinions April 25, 1974.

## ORDER

The Panel having found, upon the basis of the papers submitted and the hearing held, that the actions listed on the attached Schedule A involve common questions of fact and that transfer of these actions to the Central District of California for coordinated or consolidated pretrial proceedings would serve the convenience of the parties and witnesses and would further the just and efficient conduct of the litigation,

It is ordered that all actions on the attached Schedule A pending in districts other than the Central District of California be, and the same hereby are, transferred to the Central District of California and, with the consent of that court, assigned to the Honorable Malcolm M. Lucas for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407, with the actions pending in that district and listed on Schedule A.

A full opinion and order embodying the above decision will be filed upon final preparation.

## OPINION AND ORDER

Before ALFED P. MURRAH, Chairman, and JOHN MINOR WISDOM, EDWARD WEINFELD, EDWIN A. ROBSON, WILLIAM H. BECKER, JOSEPH S. LORD, III, and STANLEY A. WEIGEL, Judges of the Panel.

ALFRED P. MURRAH, Chairman, delivered the opinion of the Panel, in which EDWIN A. ROBSON, WILLIAM H. BECKER' and JOSEPH S. LORD, Judges of the Panel, joined.

### I. Background of Litigation

This complex multidistrict litigation arises out of the collapse of Equity Funding Corporation of America, a diversified financial services company based in California. In the latter part of March 1973 trading in Equity Funding's securities was halted by the New York Stock Exchange and the Securities and Exchange Commission. Soon thereafter, in an action brought by the SEC in the Central District of California, Equity Funding consented to a decree enjoining the continuation of an alleged scheme to defraud investors. And the company is now in Chapter X bankruptcy in that district.[1] Numerous civil actions, involving in some respects the alleged fraud, have been filed in different federal district courts throughout the country. The majority of these actions are pending either in the Central District of California [2] or the Southern District of New York.[3]

Defendant Seidman & Seidman, joined by numerous other parties, has moved to transfer all actions to the Central District of California for coordinated or consolidated pretrial proceedings.[4] Practically all of the parties to the litigation favor coordinated or consolidated

---

1. The bankruptcy proceedings are assigned to the Honorable Harry Pregerson of the Central District of California.

2. The civil actions filed in the Central District of California have been assigned to the Honorable Malcolm M. Lucas.

3. The civil actions filed in the Southern District of New York have been assigned to the Honorable Lee P. Gagliardi.

4. In litigation of this magnitude it is not unusual that the moving party is not a "party" to all actions "in which transfer for coordinated or consolidated pretrial proceedings under this section may be appropriate," 28 U.S.C. § 1407(c)(ii). A purely literal read-

ing of Section 1407(c)(ii) suggests that a party may only move for transfer of an action in which it appears as a party. Such a narrow reading, however, is not consistent with the purposes and intent of the legislation. In any event, any argument challenging movant's right to request transfer of an action in which it does not appear as a party was disposed of by the Panel, which, on its own initiative, simply ordered all parties to actions arising out of the collapse of Equity Funding to show cause why those actions should not be transferred to a single district or districts for coordinated or consolidated pretrial proceedings under Section 1407.

pretrial proceedings under Section 1407 in some form or to some extent. Some of the parties, however, insist on bifurcation of the litigation and transfer of certain groups of cases to the Southern District of New York where most of the actions comprising those groups are now pending.

The matter has been extensively briefed and twice orally argued. The real issue confronting us is whether all the litigation should be transferred to a single district and assigned to a single judge under Section 1407 or whether the litigation should be bifurcated with two transferee forums. For reasons which we shall articulate, we have decided that the convenience of the parties and witnesses and the just and efficient conduct of the litigation can best be served by transfer of all of the litigation to the Central District of California and, with the consent of that court, assigned to the Honorable Malcolm M. Lucas for coordinated or consolidated pretrial proceedings pursuant to Section 1407.

## II. Litigation before the Panel

A classification of the claims asserted in the litigation is essential to an understanding of the considerations which prompt us to transfer all actions to one district and assign them to one judge for Section 1407 treatment.

### A. Primary or Underlying Fraud Claims

The primary or underlying fraud claims relate to an alleged scheme by Equity Funding and its subsidiaries to inflate assets and earnings by, among other things, creating and selling to reinsurers bogus life insurance policies in order to present to the investing public an image of a successful, growing and prosperous enterprise. The alleged fraud, facilitated by the use of computers, enabled Equity Funding to overstate its assets and record non-existent assets, which eventually appeared in its financial statements. The defendants in the fraud actions typically include Equity Funding, its officers, directors and sub-

sidiaries, and its accountants and auditors who prepared the financial statements and reports which concealed the alleged fraud.

### B. Trading or So-Called "Tippee" Claims

These claims are asserted by purchasers of Equity Funding's securities against parties who allegedly possessed material, non-public information concerning Equity Funding and traded in the securities of the corporation without making such information generally available to the investing public. Plaintiffs typically allege that in March 1973 a former Equity Funding employee informed a securities analyst for a research oriented brokerage firm that a massive fraud was being perpetrated at the company; that the analyst conducted his own investigation and passed the information he gathered to certain investors and agents for investors in Equity Funding's securities; and that those in possession of this inside information used it to their advantage until trading in all securities of Equity Funding was suspended. Plaintiffs also necessarily allege the facts of the primary or underlying fraud.

Some of the complaints which contain trading or "tippee" claims name as defendants not only parties which allegedly traded securities when in possession of inside information but also party-defendants to the primary fraud claims.

### C. Combination Primary Fraud-Trading Claims

Some of the complaints contain a single claim for relief based upon allegations of both primary fraud and trading on inside information.

### D. Underwriting Claims

These claims are asserted by purchasers of debentures of Equity Funding and focus upon the financial statements in the separate registration statements and prospectuses disseminated with respect to the public offerings of the debentures. The claims necessarily con-

tain allegations relating to the underlying fraud at Equity Funding.

### E. Rescission Claims

Claims for rescission and damages are made arising out of Equity Funding's acquisition of Bankers National Life Insurance Company and Liberty Savings & Loan Association. Plaintiffs were stockholders in the corporations at the time of the acquisitions and received Equity Funding stock in exchange for their shares. They allege that the financial statements used by Equity Funding in connection with the acquisitions were false and misleading. But included in plaintiffs' claim for rescission are allegations concerning facts relevant to the primary fraud.

### F. Miscellaneous Claims

#### 1. Contract Action

■ This action involves a contractual dispute between duPont, Glore Forgan and Federated Income and Private Placement Fund concerning the sale of Equity Funding debentures.[5] DuPont, Glore Forgan alleges that Federated Income breached its contract to purchase the debentures and misrepresented its willingness to pay for them under all circumstances. Clearly, this action has nothing in common with the other actions and since no purpose would be served by transfer under Section 1407, it should remain in the Southern District of New York.

#### 2. Indenture Trustee Actions

■ Independent Investor Protective League has filed two actions in the Southern District of New York against the indenture trustees of the Equity Funding debentures, alleging that the trustee violated its fiduciary duties to protect the rights of the bondholders.[6] Plaintiff is opposed to transfer of either of the actions. The complaints on their face, however, raise questions of fact common to the other actions and we find that these parties will to some extent benefit from participation in the coordinated or consolidated pretrial program in California.

#### 3. Broker-Dealer Actions

■ Individuals who purchased Equity Funding securities before trading was suspended have filed actions against their brokers and representative agents alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.[7] These actions necessarily involve the primary fraud at Equity Funding and, in order to eliminate the possibility of duplicative discovery and inconvenience to the parties and witnesses, they should be transferred to the Central District of California and placed under the general supervision of the transferee judge.[8] If separate treatment is warranted, however, plaintiffs may address these arguments to the transferee judge who may fashion a pretrial program to suit the needs of these plaintiffs and, when appropriate, recommend to the Panel that the actions be remanded to their respective transferor courts for further proceedings.

### G. Unified and Consolidated Complaints

Pursuant to pretrial orders entered in the Central District of California and the Southern District of New York, a

5. DuPont, Glore Forgan, Inc. v. Federated Income and Private Placement Fund, S.D. N.Y., Civil Action No. 73 Civ. 1683.

6. Independent Investor Protective League, etc. v. Chemical Bank et al., S.D.N.Y., Civil Action No. 73 Civ. 1551; Independent Investor Protective League, etc. v. First National City Bank, S.D.N.Y., Civil Action No. 73 Civ. 2213.

7. John W. Dalton v. Goldman, Sachs & Co., S.D.Texas, Civil Action No. 73–H–684; Alfred Grien, Trustee, v. A. G. Becker & Co., et al., S.D.N.Y., Civil Action No. 73 Civ. 2946; and Lawrence M. Wiener, et ux v. Oppenheimer & Co., et al., S.D.N.Y., Civil Action No. 73 Civ. 2420.

8. Cf. In re Four Seasons Securities Laws Litigation, 344 F.Supp. 1404 (Jud.Pan.Mult. Lit.1972) and 352 F.Supp. 962 (Jud.Pan. Mult.Lit.1972).

set of unified and consolidated complaints have been filed. Plaintiffs in California have filed a single unified and consolidated complaint containing requests for definition of four separate classes encompassing the primary fraud, trading or tippee, underwriting and rescission claims as described earlier.[9] In the Southern District of New York, four separate consolidated class action complaints have been filed.[10] The alleged classes as defined in the New York complaints overlap and conflict with the class allegations in the California consolidated complaint.[11]

### III. The Question of Transfer

■ The parties favoring bifurcation suggest that the primary fraud issue is only peripherally involved in the trading, underwriting and rescission claims

and that most of the legal issues and discovery with respect to those claims have nothing in common with the primary fraud claims. They therefore argue that the primary fraud claims be transferred to the Central District of California and that the trading or "tippee," underwriting and rescission claims be transferred to the Southern District of New York for separate coordinated or consolidated pretrial proceedings.

We start with the proposition that the alleged primary or underlying fraud actuates the entire litigation and, to some extent at least, conditions the various plaintiffs' right to recover in all of the actions. The nature and quantum of proof of the alleged primary fraud necessarily depends on and varies with the legal theories of the cases. Not all of the discoverable proof is common to all

9. The California consolidated complaint contains Rule 23 class allegations with respect to the following described classes:

(1) *Open Market Purchasers:* All persons who purchased common stock, debentures, or warrants of Equity Funding Corporation of America, or its subsidiaries, on the open market beginning at least in 1964 and ending March 28, 1973, the exact period of time being unknown to plaintiffs because of the fraudulent concealment of the defendants, and who sustained damage as a result of the fraudulent practices and scheme hereinafter alleged.

(2) *Original Issue Purchasers:* All persons who purchased debentures issued by Equity Funding Corporation of America as described below, and who continue to hold said debentures and who sustained damages as a result of the fraudulent practices and scheme hereinafter alleged.

(i) a 5½% debenture due 1991 offered by prospectus dated in 1971;

(ii) a 9½% debenture due 1990 offered by prospectus dated in 1970; and

(iii) a 5¼% debenture issue, unlisted, issued by Equity Funding Capital Corporation and guaranteed by EFCA, due 1989.

(3) *Exchange of Stock Purchasers:* All persons who purchased securities of Equity Funding Corporation of America by exchanging stock owned in the two corporations noted below for said securities, and who were injured as a result of the fraudulent practices and scheme hereinafter alleged.

(i) Bankers National Life Insurance Company, ('Bankers'), said exchange taking place on or about October 12, 1971.

(ii) Liberty Savings & Loan Association, ('Liberty'), said exchange taking place on or about September 14, 1970.

(4) *March 1973 Security Purchasers:* All open market purchasers, or purchasers who relied on the open market price, of securities of Equity Funding Corporation of America without knowledge of the fraudulent practices and scheme hereinafter alleged between March 6, 1973, and March 28, 1973, and who sustained damage as a result of the fraudulent practices and scheme hereinafter alleged, and as a result of the acquisition, utilization, and dissemination of inside information by certain defendants regarding said fraudulent scheme as hereinafter alleged.

10. (1) A unified consolidated class action complaint on behalf of trading class.

(2) A unified consolidated complaint in class actions brought on behalf of former stockholders of Bankers National Life Insurance Company.

(3) A unified consolidated complaint in underwriting class actions.

(4) A unified consolidated complaint in fraud and miscellaneous class actions.

11. For example, in the New York consolidated complaint on behalf of the "trading class" no fewer than 14 separate class allegations are made, which conflict not only with the California plaintiffs' alleged class on behalf of "March 1973 Security Purchasers," but also with other classes alleged in the California unified and consolidated complaint.

actions. For example, the trading, underwriting and rescission claims may very well turn on operative facts not distinctly relevant to the primary fraud claims. But even so it cannot be said that the alleged underlying fraud is entirely irrelevant or non-essential to the establishment of each of the stated cases. The allegations as drafted speak loudly in that respect. Indeed, as we have seen for example, the facts of the primary fraud are carefully pleaded in each of the counts contained in the unified consolidated complaints filed in the Southern District of New York.

Our decision is necessarily based on the pleadings and oral argument of counsel, whose statements of fact are understandably colored by their manifest interest in the locale of the pretrial processing. Defendants do not concede the alleged fraud at Equity Funding and it must, of course, be proven as pleaded. We are governed by the facts as pleaded and we cannot assume that they will be admitted. The facts of the primary fraud underlie and undergird each action. This fact alone augurs for the transfer of all of the litigation to a single district under Section 1407.

We know that proof in litigation of this kind consists primarily of documents and depositions. And it is not the province of the Panel to determine the nature or quantum of proof relevant and discoverable by depositions and production of documents. These decisions must necessarily be left to the transferee judge who has the power and the duty to organize the discovery program to prevent duplication and unnecessary inconvenience to the parties and witnesses.

*Coordinated or Consolidated Pretrial Proceedings*

■■ The statute speaks in terms of transfer to "any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). Used in the disjuctive, the critical words denote different judicial functions. They are indicative of the flexibility and resourceful-

ness implicit in the legislation. They were undoubtedly intended to confer on a transferee judge the power to fashion the discovery program to accommodate the different facets and nuances of the litigation. It is the province of the Panel to decide whether in the first instance the litigation should be *transferred* for coordinated or consolidated pretrial proceedings. It is the province of the transferee judge to determine whether and to what extent the pretrial proceedings should be coordinated or consolidated. We have repeatedly declined to attempt to determine in what way and to what extent the litigation should be coordinated or consolidated. From the very beginning we have left that determination to the discretion of the transferee judge.

The concept of transferring actions, sharing one or more common questions of fact but resting upon different legal theories, to a single district and assigning them to the same judge is not new to the Panel. We have always been at pains to leave the extent of coordination or consolidation to the ingenuity and resourcefulness of the transferee judge. In the very beginning we were confronted with the problem of transfer of actions in the Plumbing Fixtures litigation, arising out of two alleged criminal conspiracies charged in two separate indictments. *See* In re Plumbing Fixtures Cases, 295 F.Supp. 33 (Jud.Pan.Mult.Lit. 1968). The so-called "short-line" defendants in that litigation objected to consolidated discovery proceedings on the ground that the civil actions were based upon separate conspiracies and that discovery would not be common to all cases. And they argued that it would be prejudicial to coordinate their discovery with the other cases in which they were not parties and had no interest. We recognized the separability of the alleged conspiracies, but we nevertheless transferred all the cases to one district ". . . leaving to the transferee judge the sole power to determine in his discretion the order and procedures for conducting separate pretrial proceedings in respect to

the separate alleged conspiracies." *Id.* at 34.

In two other notable groups of litigation we rejected suggested bifurcation, leaving the extent to which the transferred litigation should be coordinated or consolidated to the ingenuity and resourcefulness of the transferee judge. *See* In re Revenue Properties Company Securities Litigation, 309 F.Supp. 1002 (Jud.Pan.Mult.Lit.1970), and In re Seeburg-Commonwealth United Merger Litigation, 312 F.Supp. 909 (Jud.Pan.Mult. Lit.1970). In the latter litigation we noted that while the two groups of cases might be appropriate for bifurcated treatment they did involve sufficient commonality of fact to warrant transfer of all actions to a single district "to be conducted by a judge familiar with both groups of cases and sensitive to the needs and rights of all parties." And we observed that:

> "The transferee judge may then consolidate and coordinate the pretrial proceedings in the two groups of cases to the extent he may deem consolidation or coordination desirable to serve the convenience of parties and witnesses and to promote the just and efficient conduct of such actions." In re Seeburg-Commonwealth United Merger Litigation, 312 F.Supp. 909, 911 (Jud.Pan.Mult.Lit.1970).

The parties favoring bifurcation suggest that the Penn Central litigation provides an ideal model for bifurcating these proceedings. In that litigation we transferred all of the securities fraud litigation growing out of the financial difficulties of the Penn Central Transportation Company to the Eastern District of Pennsylvania [12] and later ordered all actions arising from the sale of Penn Central Commercial Paper to the Southern District of New York. [13]

We ordered separate coordinated or consolidated pretrial proceedings for the commercial paper litigation because we found that those cases rested upon a different set of primary facts than those involved in the fraud actions in Philadelphia. But we transferred the bondholder actions to the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings with the other fraud actions. The bondholder plaintiffs opposed transfer on the ground that they were proceeding only against the underwriters and accountants who participated in the issuance of the bonds and that their discovery would not be common to the fraud actions. We were not persuaded:

> "Although the extent of the factual overlap is not certain, it is sufficient to· require these bond cases to be assigned with the other cases for pretrial purposes. The bondholding plaintiffs may present their arguments for separate treatment to the transferee judge, who is given the discretion to decide the extent of coordination or consolidation desirable in cases assigned to him under Section 1407." In re Penn Central Securities Litigation, 322 F.Supp. 1021, 1022–1023 (Jud.Pan.Mult.Lit.1971).

We think the reasons for transfer of the bond actions in the Penn Central Litigation equally persuasive to support the transfer of all actions in this litigation to the Central District of California for coordinated or consolidated pretrial proceedings.

*Potential Conflict in Rule 23 Class Determinations*

■ There is yet another highly persuasive if not compelling reason for transfer of all actions to a single judge. We have consistently held that transfer

---

12. In re Penn Central Securities Litigation, 322 F.Supp. 1021 (Jud.Pan.Mult.Lit.1971).

13. In re Penn Central Commercial Paper Litigation, 325 F.Supp. 309 (Jud.Pan.Mult. Lit.1971). It was the unique nature of commercial paper as well as the magnitude of the fraud litigation in Philadelphia which prompted us to order plaintiffs' claims for relief to a separate district for separate Section 1407 treatment. Inasmuch as commercial paper is the unsecured equivalent of cash, it was clear to us that the claims for relief by holders of unsecured commercial paper were distinguishable from other conventional claims for relief by holders of conventional securities.

of actions under Section 1407 is appropriate, if not necessary, where the possibility for conflicting, inconsistent class determinations by courts of coordinate jurisdiction exists.[14] The complaints vary from the most precise and skillfully drafted documents depicting a high degree of legal artistry to what may be described as legal boilerplate. But a majority of the actions contain Rule 23 class allegations based upon the primary fraud. Facially at least the potentiality of inconsistent class determinations is readily apparent.

 Because of the potential if not likely conflict of class action determinations, we think this litigation should be assigned to a single judge with the sole responsibility for making the class action determinations "as soon as practicable . . . ." *See* Fed.R.Civ.P. 23(c)(1). *See also* Manual for Complex Litigation, Part I, Section 1.40 (revised edition 1973).

The transferee judge, with all claims and all parties before him, will have a clear picture of the scope and complexity of the litigation, essential to making the class determinations. Once the class decisions are made, he will then be in a position to ascertain the scope of discovery common to all actions and formulate a pretrial schedule responsive to the various demands of the litigants. As Judge Wisdom observed in In re Four Seasons Securities Laws Litigation, 328 F.Supp. 221 (Jud.Pan.Mult.Lit.1971):[15]

"Should conflicts concerning discovery objectives develop . . ., they may be presented to the transferee judge to decide the extent of the coordination or consolidation of pretrial proceedings." *Id.* at 223.

### The Meaning of Transfer of All Actions to a Single District

Transfer of all actions to California does not mean that all discovery proceedings will take place there. There is no necessity for lawyers to travel across the continent to participate in pretrial discovery which has no bearing on their litigation. Indeed, the Manual for Complex Litigation contains recommendations to protect a party disinterested in a particular aspect of discovery.[16] Transfer does mean, however, that the responsibility for determining what discovery is common and what is independently irrelevant to the stated theories and issues rests in a single judge who, with an overall perspective of the entire litigation and the cooperation of counsel, can schedule the discovery to minimize the expense to the parties and maximize the just and expeditious termination of the litigation.

We are well aware of the burdens this litigation will impose upon the transferee court. But we are equipped to provide assistance and it is precisely in this context that we can demonstrate the flexibility and resourcefulness of Section 1407, while at the same time providing for complete control over all aspects of this litigation. The Panel is authorized under the statute to provide deposition judges to assist the transferee court. 28 U.S.C. § 1407(b). Inasmuch as the actions presently pending in New York are all assigned to Judge Gagliardi, who will presumably be responsible for them if remanded by the Panel at or before the conclusion of the pretrial proceedings, he may very well preside over the depositional discovery which will necessarily take place in New York. In this way, he will be familiarized with the issues

---

14. *See, e. g.,* In re Brown Company Securities Litigation, 325 F.Supp. 307, 308 (Jud. Pan.Mult.Lit.1971); In re Texas Gulf Sulphur Securities Litigation, 344 F.Supp. 1398, 1400 (Jud.Pan.Mult.Lit.1972); In re Career Academy Antitrust Litigation, 342 F.Supp. 753, 754 (Jud.Pan.Mult.Lit.1972); In re Plumbing Fixtures Cases, 298 F.Supp. 484, 493 (Jud.Pan.Mult.Lit.1968).

15. Like the instant litigation, Four Seasons was also involved in a Chapter X reorganization under the bankruptcy laws in the transferee court.

16. *See, e. g.,* Manual for Complex Litigation, Part I, section 2.31 (rev.ed. 1973).

and nature of the evidence involved in the event the actions or certain claims are remanded to him for further proceedings.

Furthermore, the flexibility of the statute empowers the Panel to "separate any claim, cross-claim, counterclaim or third party claim and remand any of such claims before the remainder of the action is remanded." 28 U.S.C. § 1407(a). Once the parties have succeeded in obtaining the necessary discovery of the alleged underlying fraud, the transferee judge may in his discretion conclude that certain claims are appropriate for remand by the Panel. Thus, claims outside the mainstream of the over-all litigation may successfully be brought to conclusion with a minimum of delay and expense to the parties while at the same time reserving to a single judge the efficient administration so important to an expeditious termination of the complete litigation.

IV. *Selection of the Transferee Forum*

Virtually all parties concede that the Central District of California is the most appropriate transferee forum for the primary or underlying fraud claims. We agree and, furthermore, conclude that it is the most appropriate transferee district for all the litigation. The documents and the majority of the witnesses relevant to the alleged underlying fraud at Equity Funding, as well as the Chapter X bankruptcy proceedings, are located within that district. On balance, we find that transfer of all of these actions to the Central District of California will best serve the convenience of the majority of the parties and witnesses and promote the just and efficient conduct of the litigation.

It is therefore ordered that all actions on the appended Schedule A pending in districts other than the Central District of California be, and the same hereby are, transferred to that district and, with the consent of that court, assigned to the Honorable Malcolm M. Lucas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 with the actions pending in that district and listed on Schedule A.

WILLIAM H. BECKER, Judge of the Panel, filed a concurring opinion.

JOHN MINOR WISDOM, Judge of the Panel, filed a dissenting opinion, in which EDWARD WEINFELD and STANLEY A. WEEGEL, Judges of the Panel, joined.

### SCHEDULE A

**Central District of California**

| | |
|---|---|
| Anne Oringer, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–705–MML |
| Anne Oringer, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–706–MML |
| May Miller, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–707–MML |
| Michael Zucker, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–708–MML |
| Simon Singer, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–717–MML |
| David M. Stern, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–735–MML |
| Shigeo Matsuhara, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–741–MML |
| Hy Hacker, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–742–MML |
| Hy Hacker, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–743–MML |
| Sylvia Consino, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–753–MML |
| Jerry Goldstein, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–754–MML |
| Stanley Ferber v. Stanley Goldblum, et al. | Civil Action No. C–73–756–MML |
| Isidore Miller, et al. v. Stanley Goldblum, et al.* | Civil Action No. C–73–784–MML |
| Franz Paul, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–797–MML |
| Sue Cholondenko, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. C–73–808–MML |
| Martin B. Nimkoff, et al. v. Stanley Goldblum, et al. | Civil Action No. C–73–832–MML |
| James N. Routh, etc. v. Equity Funding Corp. of America, et al.** | Civil Action No. C–73–710–MML |
| Robert M. Loeffler, etc. v. Stanley Goldblum, et al. | Civil Action No. C–73–1034 |
| Securities & Exchange Commission v. Equity Funding Corp. of America | Civil Action No. C–73–714 |
| Merrill Lynch, Pierce, Fenner & Smith, Inc. v. H. Lynden Taylor Corp. | Civil Action No. 73–1188–CC |

* Dismissed by Judge Lucas on July 2, 1973.

** Dismissed by Judge Lucas on April 16, 1973.

### Southern District of New York

| | |
|---|---|
| May Miller, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 1374 |
| Benjamin Messinger, etc. v. Stanley Goldblum, et al. | Civil Action No. 73 Civ. 1390 |
| A. Bruce Rosow, etc. v. Equity Funding Corp. of America | Civil Action No. 73 Civ. 1396 |
| Michael W. Untermeyer, et al. v. Equity Funding Corp. of America | Civil Action No. 73 Civ. 1444 |
| Isidore Miller, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 1466 |
| Betty Levine, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 1475 |
| Guy Michaels v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 1485 |
| A. Richard Parkoff, etc. v. Stanley Goldblum, et al. | Civil Action No. 73 Civ. 1528 |
| Nat Berens, et al. v. Bache & Co., Inc., et al. | Civil Action No. 73 Civ. 1604 |
| Pinetree Fund, Inc. v. Stanley Goldblum, et al. | Civil Action No. 73 Civ. 1605 |
| Fidelity Corp. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 1623 |
| Fidelity Corp. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 1624 |
| Arnold Elkind v. Stanley Goldblum, et al. | Civil Action No. 73 Civ. 1645 |
| Independent Investor Protective League v. Seidman & Seidman, et al. | Civil Action No. 73 Civ. 1957 |
| Independent Investor Protective League, etc. v. Raymond L. Dirks, et al. | Civil Action No. 73 Civ. 1519 |
| Salomon Brothers v. John W. Bristol & Co., et al. | Civil Action No. 73 Civ. 1556 |
| Nat Berens, et al. v. Fiduciary Trust Co. of New York, et al. | Civil Action No. 73 Civ. 1684 |
| Lawton General Corp., etc. v. The Boston Co., Inc., et al. | Civil Action No. 73 Civ. 1691 |
| Arthur Rogosin, etc. v. Chemical Bank, et al. | Civil Action No. 73 Civ. 1885 |
| Independent Investor Protective League, etc. v. Seidman & Seidman, et al. | Civil Action No. 73 Civ. 1994 |
| Lisadent, Inc. v. Delafield Childs Inc., et al. | Civil Action No. 73 Civ. 2032 |
| Russell J. Priskwaldo, etc. v. Stanley Goldblum, et al. | Civil Action No. 73 Civ. 2146 |
| Independent Investor Protective League, etc. v. Chemical Bank, et al. | Civil Action No. 73 Civ. 1551 |
| Jefferies & Co., Inc. v. Yura Arkus Duntov, et al. | Civil Action No. 73 Civ. 1407 |
| Guy Michaels v. The Boston Co., et al. | Civil Action No. 73 Civ. 1476 |
| Independent Investor Protective League v. New York Securities Co. | Civil Action No. 73 Civ. 2824 |
| Robert R. Felton v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 2201 |
| Max Israelson, et al. v. John W. Bristol, & Co., Inc., et al. | Civil Action No. 73 Civ. 2269 |
| Murray Gilbert, et al. v. Bankers Trust Co., et al. | Civil Action No. 73 Civ. 2453 |
| Edwards & Hanly, etc. v. The Boston Co., et al. | Civil Action No. 73 Civ. 2307 |
| Salomon Brothers v. The Savings and Profit Sharing Pension Fund of Sears, Roebuck & Co. | Civil Action No. 73 Civ. 2531 |
| Stanley Spielman, etc. v. Seidman and Seidman, et al. | Civil Action No. 73 Civ. 2603 |
| Independent Investor Protective League v. First National City Bank of New York, et al. | Civil Action No. 73 Civ. 2213 |
| Lawrence M. Weiner v. Oppenheimer & Co. | Civil Action No. 73 Civ. 2420 |
| Independent Investor Protective League, et al. v. Stanley Goldblum, et al. | Civil Action No. 73 Civ. 3115 |
| Jonas M. L. Cohen, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 3255 |
| Irvin Davison v. Boston Co. Institutional Investors, Inc. | Civil Action No. 73 Civ. 3256 |
| Kent M. Klineman, et al. v. Equity Funding Corp. of America | Civil Action No. 73 Civ. 3164 |
| Lowell S. Fink, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 3275 |
| Harold I. Cole v. Equity Funding Corp. of America, et al. | Civil Action No. 73 Civ. 3314 |
| Alfred Grien, Trustee v. A. G. Becker & Co., et al. | Civil Action No. 73 Civ. 2946 |

### Northern District of Illinois

| | |
|---|---|
| Millicent Jones, et al. v. Equity Funding Life Insurance Co., et al. | Civil Action No. 73 C 879 |
| Marc Gould, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. 73 C 905 |
| F. J. Lunding, et al. v. Equity Funding Life Insurance Co., et al. | Civil Action No. 73 C 2018 |

### District of Maryland

| | |
|---|---|
| Irvin Davison, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. 73–333–H |
| Jonas M. L. Cohen, etc. v. Equity Funding Corp. of America, et al. | Civil Action No. 73–357–H |

### Eastern District of Pennsylvania

| | |
|---|---|
| Robert Selig, et al. v. Equity Funding Corp. of America, et al. | Civil Action No. 73–845 |
| Merion Associates, etc. v. Equity Funding Corp. of America, et al. | Civil Action • No. 73–813 |

### Southern District of Texas

| | |
|---|---|
| John W. Dalton v. Goldman, Sachs & Co. | Civil Action No. 73–H–684 |

WILLIAM H. BECKER, Judge of the Panel (concurring).

In addition to full concurrence in the majority opinion, a draft of this concurring opinion was prepared when only the

majority opinion was available. The purpose of the original draft was to emphasize the important differences in the facts of this case compared to the facts of the second Penn Central case, on which was based the decision to separate the commercial paper cases, pending in other districts, and to transfer them to the Southern District of New York. In re Penn Central Litigation, 325 F. Supp. 309 (Jud.Pan.Mult.Lit.1971).

Only this week did the dissenting opinion become available. There is a temptation to comment on the unusual rhetoric of parts of the minority opinion,[1] including the attribution to the majority of a "but for" rule, never formulated, enunciated or applied overtly or covertly, consciously or subconsciously in any decision of the Panel. Except for correcting the inaccurate historical reference to the electrical equipment private antitrust cases, the comment will be limited.

### The History of the Electrical Equipment Litigation

In fairness to the able advocates and judges who processed this electrical equipment litigation in cooperation with the Co-Ordinating Committee for Multiple Litigation, it is noted that the Co-Ordinating Committee did much more in the electrical equipment cases than that stated in the minority opinion. The minority opinion states that "In a relatively short time the Committee settled 25,000 claims in 1,900 actions filed in 36 districts." The facts are that the Co-Ordinating Committee did not settle any cases. The parties settled the cases after (1) most of them had been prepared for trial through a national pretrial program of discovery and pretrial, (2) many appellate decisions on vital legal questions had been secured, and (3) full

trials in a substantial number of representative pilot cases had been conducted to final judgments.[2] In the course of the pretrial proceedings, many fully litigated adversary appellate reviews of trial court rulings were submitted and finally decided in the Courts of Appeals. These accomplishments provided the experience and bases for the parties to assess the potential liabilities for negotiating settlements.

The Co-Ordinating Committee and the cooperating judges proceeded on the assumption that any and all actions would be subject to trial until final settlements were filed and incorporated in judgments. See, Neal and Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B. A.J. 621 (1964); Peterson and McDermott, Multidistrict Litigation: New Forms of Judical Administration, 56 A. B.A.J. 737 (1970); Bane, The Electrical Equipment Conspiracies: The Treble Damage Actions, Federal Legal Publications, Inc., New York (1973).

Former Chief Justice Earl Warren accurately summarized the history of the processing of the electrical equipment antitrust actions in his address to the 1967 annual meeting of the American Law Institute as follows:

And now I turn to some highly dramatic developments in administration in the federal courts. When I addressed the American Law Institute in 1962, I called to your attention the appearance the year before of unprecedented multi-district litigation arising out of antitrust suits in the electrical equipment industry. Beginning in 1961, there were filed in 35 district courts 25,623 separate civil antitrust claims for relief—1,912 civil actions, in many of which multiple plaintiffs joined their separate claims in a sin-

---

1. The terms "tippee" cases, "trading" cases, and "non-fraud" cases are terms employed by some of the advocates in this litigation opposing transfer. They tend to obscure the common issues of fact in all the actions. Further the designation "non-fraud case" is a misnomer. No one has identified an action

in which the alleged fraud is not an essential unadmitted element.

2. Panel member Chief Judge Joseph S. Lord III presided with distinction at the trial of the first pilot case which began on March 16, 1964, and concluded with a jury verdict on June 2, 1964.

gle action and in many of which there were multiple counts each based on a separate claim. Each claim for relief was a potentially protracted case and, as I reported, this unprecedented multidistrict litigation was imposed upon the ever-increasing burden of the ordinary civil and criminal dockets. Our alarm was understandably great and makes equally understandable the measure of my satisfaction in being able to report to the Institute at this meeting that every single one of these cases has been terminated. Not a single one remains pending. Whatever backlog problems the federal courts may have, they do not include any of these cases.

Now, this is history—stimulating and useful history. This remarkable result was achieved by the foresight and organizing ability of a committee of the Judicial Conference of the United States, with Chief Judge Alfred P. Murrah of the Tenth Circuit as its chairman and with Judge Edwin A. Robson of the Northern District of Illinois and Chief Judge William H. Becker of the Western District of Missouri as successive chairmen of its principal subcommittee. These judges, without a chart and without the power to change the rules of procedure created for less demanding tasks, secured the full cooperation of all the district judges to whom these cases were assigned. They were assisted by a small, temporary staff, provided by the Administrative Office on an emergency basis, and now have succeeded in terminating these 1,912 antitrust cases in a period of six years and two months, which would not be regarded as an unusual length of time for the processing of a single complex antitrust case. If it had not been for the monumental effort of the nine judges on this committee of the Judicial Conference and the remarkable cooperation of the 35 district judges before whom these cases were pending, the district court calendars throughout the country could well have broken down.

*Comparison with the Penn Central Commercial Paper Litigation*

One of the questions presented in this litigation is whether the decision in the majority opinion is consistent with the Penn Central Commercial Paper decision reported at 325 F.Supp. 309 (Jud.Pan. Mult.Lit.1971).

The most important factual difference in the Penn Central Commercial Paper cases was the nature of the obligations of the commercial paper itself and the manner and purpose of its sale and purchase. This commercial paper differed from conventional investment securities, like common stock, preferred stock, and debentures bought for relatively long-term conventional investment, and dependent, wholly or in part, on the amount of earnings of the issuing company for their value and rate of return. The commercial paper in the Penn Central cases consisted of short-term notes purchased from Goldman, Sachs & Co., in great principal amounts, to be used in place of money. It was a unique form of commercial paper in the limited and strict sense noted in the following definition:

> *commercial paper*, comprehensive term for all kinds of short-term negotiable instruments which call for the payment of money and which may be used as COLLATERAL. The term is sometimes loosely applied to contracts and agreements. More strictly it includes only those instruments that are used in commerce in place of money, as distinguished from paper used in investment, personal, estate, speculative, and public transactions. It includes short-term notes, drafts, bills of exchange and checks, acceptances, bills of lading, warehouse receipts, orders for delivery of goods, and express orders. By borrowing on bills of lading or warehouse receipts (receipts from a transportation company or a warehouse showing that specified goods

have been delivered to it), wholesale merchants are enabled to handle goods greatly in excess of their capital. The salability of commercial notes is based on the financial strength of the borrower, as they are not backed by collateral. Express orders are issued by express companies for small amounts, payable at any office of the company. They may also be banked like checks. See A. O. Greef, The Commercial Paper House in the United States (1939). The Columbia Encyclopedia, 3rd ed., p. 459, Columbia University Press, 1963.

The exceptional nature of the paper, the exceptional manner and purpose of its sale and purchase, and the alleged concealment and misrepresentations of the seller made those cases, pending in other districts, separable and transferable to the Southern District of New York. In a discriminating decision (abjuring the mythical "but for" rule) the Panel transferred the similar actions pending in other districts to the Southern District of New York for processing by the able and experienced Honorable David N. Edelstein, now Chief Judge of that district. In refusing to transfer the commercial paper claims for relief pending in the Southern District of New York to the Eastern District of Pennsylvania, to which all other related Penn Central securities actions had been transferred, the Panel said:

> We conclude that the commercial paper cases are sufficiently different from the earlier cases that neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation would be served by their transfer to Philadelphia [for section 1407 pretrial proceedings]. 325 F.Supp. 309, 311 (Jud.Pan.Mult. Lit.1971).

The Uniform Commercial Code recognizes, preserves, and sharpens the distinction between "commercial paper" (described as "money paper"), "documents of title" (described as "commodity paper"), and "investment securities."

Articles 3, 7, and 8, and comment to § 7–104, U.C.C.

### Confidence in the Transferee Judge

The majority decision in this litigation is founded on confidence, rather than fears as suggested in the minority opinion. The confidence on which it is founded is confidence in the transferee judge, repeatedly justified by prior experience of the Panel.

There is confidence that the transferee judge will grant all reasonable requests for priority in discovery. *See, e. g.,* In re IBM Antitrust Litigation, 319 F.Supp. 926 (Jud.Pan.Mult.Lit.1970). Arguments and pessimistic prophecies similar to those in the minority opinion have been made repeatedly before the Panel and disproved later by experience. The same dire predictions of delay were made by the minority in the Yarn Processing Patent Validity Litigation decision reported at 341 F.Supp. 376 (Jud. Pan.Mult.Lit.1972), and dispelled by subsequent events.

In the exceedingly complex *IBM Antitrust Litigation* the less complex *Telex* and Greyhound Computer actions were transferred under Section 1407 to the District of Minnesota and assigned to the late able Honorable Philip Neville, United States District Judge. In re IBM Antitrust Litigation, 342 F.Supp. 200 (Jud.Pan.Mult.Lit.1972) ; In re Multidistrict Private Civil Treble Damage Litigation Involving IBM, 319 F.Supp. 926 (Jud.Pan.Mult.Lit.1970). Proper priority in discovery was given to the less complex cases, after which they were transferred or remanded and swiftly tried in the District of Arizona and the Northern District of Oklahoma without awaiting completion of discovery in the more complex actions. *See,* Greyhound Computer Corp. v. IBM, 342 F.Supp. 1143 (D.Minn.1972). These examples of efficient administration by a transferee judge make it evident that imagined difficulties may be easily avoided.

JOHN MINOR WISDOM, Judge of the Panel (with whom EDWARD

WEINFELD and STANLEY A. WEI-GEL, Judges of the Panel, join, dissenting):

I respectfully dissent.

"The objective of the legislation [28 U.S.C. § 1407] is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the 'just and efficient conduct' of such actions. . . . It is expected that such transfer is to be ordered only where *significant* economy and efficiency in judicial administration may be obtained."[1] (Emphasis added.) H.R.Rep. No. 1130, 90th Cong.2d Sess. 2, 3 (1968) U.S.Code Cong. & Admin. News p. 1899. Unfortunately, this decision of the Panel exalts centralized management over the just and efficient conduct of certain important, distinctive groups of actions which may be referred to as the "non-fraud" cases because they have only a peripheral relation to the internal fraud of Equity Funding. The non-fraud cases include the trading or tippee claims, the claims by debenture holders against the underwriters, and the rescission claims. These actions have their logical situs in New York and there they are proceeding apace. To wrap them in a bundle with the different, massive, and slower-moving California litigation involving Equity Funding's internal fraud is certain to produce a significant loss in economy and efficiency in the judicial administration of the non-fraud actions.

The majority declares that since Equity Funding's underlying fraud "*actuates* the entire litigation, . . . it cannot be said that the alleged underlying fraud is entirely irrelevant or non-essential to the establishment of each of the stated cases". (Emphasis added.) But the underlying fraud within Equity Funding actuated only the action by the Securities and Exchange Commission against Equity Funding, the Chapter X bankruptcy, and the direct fraud actions brought against the company and its officers, directors, auditors, and accountants. Discovery in the fraud actions will require extensive investigation of conduct extending over many years. On the other hand, in the non-fraud cases the acts that caused the suits to be filed were not committed by Equity Funding's officials and employees. In these cases the discovery relates to the tipper, tippees, brokers, underwriters, and their accountants, and the officials of the Bankers National Life Insurance Company and Liberty Savings & Loan Association. In each of these non-fraud cases the discovery will be directed to a short definite period—of about three weeks in the trading claims.

No one favoring the Southern District of New York as the transferee district has argued that Equity Funding's internal fraud is "entirely irrelevant or immaterial". But that is not the test to determine whether there should be consolidated or coordinated pretrial administration of these cases with another class of cases. Even the existence of a common fact is not enough; the commonality must involve substantial factual issues. Transfer of all cases sharing a common question of fact to a single district deprives a litigant of his choice of forum, may increase his costs, and may entangle his action in slower moving actions involving a mass of unshared facts and many factual and legal issues irrelevant to the transferred ac-

---

1. The statute provides: "(a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. . . . "

The Senate Report states: "The main purpose of transfer for consolidation or coordination of pretrial proceedings is to promote the ends of efficient justice, but the convenience of parties and witnesses should also be a factor in determining whether such transfer should be made." Sen.Rep.No.454, 90th Cong. 1st Sess. 2 (1967).

tions. "The basic question before the Panel in each proceeding looking to co-ordinated or consolidated pretrial is, then, whether the objectives of the statute are sufficiently served to justify the necessary inconveniences of transfer and remand." [2] In re Concrete Pipe, 302 F. Supp. 244, 255 (Jud.Pan.Mult.Lit.1969) (Weigel, J. concurring). In the expository language of the House Report, the transfer must promote *"significant"* economy and efficiency in judicial administration". (Emphasis added.) I take this to mean that there must be a balancing of the advantages and disadvantages of consolidation or coordination by transfer; the relevance of a shared fact may initiate the measuring process, but the scales must weigh heavily ("significantly") in favor of transfer in terms of a just, economical, and efficient administration of the transferred cases.[3]

The majority gives a once-over-lightly treatment to the statutory requirement that the transfer serve the convenience of witnesses. It is true that witnesses are usually deposed where they reside and that deposition judges may assist the transferee court. But when most of the witnesses live in and around New York, as they do in the non-fraud cases, it cannot be disputed that it is more economical and more efficient administratively to have those cases pretried in New York rather than across the continent in

California. Moreover, the non-fraud parties will be inconvenienced if the trials of their cases are held back by the more extensive discovery required in the California cases. Of course, any party is inconvenienced if he is deprived of the forum of his choice and if his local attorney does not have an important role in the pretrial proceedings. That is inherent in transfers under Section 1407. This disadvantage may be offset in a particular case by the superior quality of lead counsel and liaison counsel, and perhaps, by a reduction in attorneys' fees and other costs when these are pooled and divided among a number of litigants. Here, however, there is no off-setting benefit for the parties in the New York litigation: they do not lack able counsel and their expenses will be substantially greater if, as appears likely, the discovery in the California fraud cases will necessarily prolong the New York litigation. In short, the "convenience of parties and witnesses" is a statutory criterion for transfer that cannot be treated as cavalierly as the majority of the Panel seems to treat it.[4]

The "just and efficient conduct" of the actions is the most important of the statutory criteria. And, as the statute and congressional reports emphasize, the existence of a common fact is not enough to justify transfer of litigation to a single district; there must be a

---

2. Judge Weigel listed many factors relevant in the balancing process. The first factors listed were: "How many common questions of fact are there? What is their nature?" Some of the other factors are: "Who are the principal witnesses in the cases and where do they reside? . . . Will transfer result in a substantial saving of duplicative work? * * * Can many of the advantages of transfer be worked out by co-operation among counsel *without* transfer? . . . Will transfer hasten or delay progress in the cases?" In re Concrete Pipe Litigation, 302 F.Supp. 244, 255 (Jud.Pan. Mult.Lit.1969).

3. "Transfer does not, of course, necessarily serve the interests of justice, efficiency, and convenience of the parties simply because common questions of fact are present. The crucial question remains whether the econo-

mies of transfer outweigh the resulting inconvenience to the parties." Comment, The Experience of Transferee Courts Under the Multidistrict Litigation Act, 39 U. of Chi.L. Rev. 588, 594 (1972).

4. The bill recommended by the Coordinating Committee for the *Electrical Equipment Cases* did not include "convenience of the parties and witnesses" as one of the standards for transfer. The Senate Judiciary Committee thought enough of this standard to add an amendment to the original bill, S. 159, because "although implicit in the bill, as introduced", an amendment was desirable to make "it clear that the convenience of parties and witnesses should be weighed as a factor in determining whether transfer should be made". Sen.Rep.No.454, 90th Cong. 1st Sess., 2.

showing that the transfer will produce "significant economy and efficiency of judicial administration". Proponents of the motion to transfer all the cases to the Central District of California have shown that, on the pleadings, Equity Funding's internal fraud is not "entirely irrelevant" to the non-fraud cases. But they have not shown that the transfer will *significantly* promote the just and efficient conduct of those actions which are not based on the Equity Funding's internal fraud.

## Trading or Tippee Claims

The primary purpose of Section 1407 is the efficient employment of limited judicial resources. This conservation of judicial energy operates in the interest of the just and efficient conduct of the litigation, as far as the parties and witnesses are concerned, only when a transfer eliminates duplicative discovery relating to similar or identical issues in two or more cases. The factual and legal issues in the cases involved in the internal fraud of Equity Funding are so different from those involved in the trading cases that, with deference, I suggest that it is a misuse of the statute to put all the cases in one mixed bag.

*Different times are involved.* The trading cases arose from trading in Equity Funding stock during the three-week period from March 6, 1973, to March 27, 1973 (only two weeks, according to Salomon Brothers). This period began when Raymond L. Dirks, a New York securities analyst, started his investigation of Equity Funding stock. It ended when the New York Stock Ex-change suspended trading in the stock and the newspapers had published the story. The primary fraud cases are based on the internal management of Equity Funding itself, going back at least to 1969 and possibly going back to 1964 when the company was organized.

The Equity Funding fraud will take years to unravel, the complex investigation will involve hundreds of witnesses, and pretrial discovery on the fraud issues will not even begin to get underway for a long time.[5] Transfer of the trading cases to the Central District of California would complicate the litigation there besides delaying the trading cases interminably, to the detriment of all litigants.

*Different places are involved.* The focus of the fraud cases is California, the central headquarters of Equity Funding. The focus of the trading cases is New York, where the relevant documents are located, and where investors and agents for investors heard and acted upon the information Dirks circulated. Most of the trading cases are pending in New York. John W. Bristol & Co., Inc., John W. Bristol, The Boston Company, Inc., Boston Institutional Investors, Inc., Boston Safe Deposit & Trust Co. (the "Bristol defendants") and Fiduciary Trust Company of New York moved to transfer the trading cases to the Southern District of New York. Counsel for several parties in the primary fraud cases who joined in the motion for transfer of all litigation to California have recognized that, "On balance, this Panel may decide that the trading claims should be transferred to the Southern District of

---

5. Judge Lucas' Pretrial Order 2, entered August 1, 1973, in the California proceedings, makes it clear that perhaps several years will be consumed in the fraud cases in discovering matters which are irrelevant to the trading cases on any construction of the facts. Thus, Judge Lucas' order in paragraph 9 outlines a series of complex problems relating to the discovery of computerized material, coordination between defendants' and plaintiffs' computers and the like. Judge Lucas directed Plaintiffs' Steering Committee to submit to the court by March 1, 1974, a pretrial brief on these issues. There is no justification for compelling the trading case parties to have to await the completion of this mammoth task, on which Judge Lucas and the fraud case plaintiffs are now embarking, of discovering the details of how the Equity Funding fraud was perpetrated; there is equally no justification for imposing upon Judge Lucas the additional burden of supervising discovery of the substantially different issues raised by the trading cases.

New York for pretrial purposes". Brief of Nelson, Liker & Marrifield for Wolfson, Weiner, Ratoff & Lagin, p. 19. Plaintiffs and defendants in the New York trading or "tippee" cases unanimously urged that their cases be allowed to remain in New York. The only Illinois party to file a memorandum, and the plaintiffs in two of the three Pennsylvania cases agreed that the fraud claims in their cases should go to California and the trading claims to New York. Only one party, the defendant accounting firm of Haskins & Sells, argued for transfer of all cases to one district—and this defendant contended that the single district should be New York, not California.

*Different defendants are involved.* The fraud cases name as defendants Equity Funding's officials and others involved in the company's management. But neither Equity Funding nor the Trustee is a party in most of the trading cases. These cases are directed against Dirks, who lives in New York, and New York banks, investment advisors, and brokerage firms. The principal tippee defendants in these cases are large New York based institutional clients of New York stock analysts.[6] The defendants in the trading cases, their officers and employees, and their books and records are located in New York. The people who did the work on the prospectuses and registration statements are in New York. The accountants for the defendants in these cases are in New York. In all of these actions it is to the convenience of the parties and the witnesses that the central situs be New York. It is significant that in the trading cases, the plain-

tiffs and the defendants are unanimous in their desire to stay in New York.

*The legal issues on liability are entirely different.* The differences are relevant to transfer under Section 1407 to the extent that the legal issues affect the factual scope of discovery.[7] "The nature and quantum of proof of the alleged primary fraud [and of the non-fraud cases] necessarily depends on and varies with the legal theories of the cases." Opinion, p. 1383. The primary fraud cases are predominantly class actions based on the liability of the defendants for fraud or the aiding or abetting of fraud in the management of Equity Funding. In the trading cases, which are separate and distinct claims for relief, the parameters in discovery are clearly defined: The defendants, strangers to Equity Funding, are charged with violating the federal securities law by trading on material inside information. Most of them received this information directly or indirectly from Dirks. The effect of the majority decision is to involve counsel in the non-fraud cases in a complex fraud case involving the internal management of Equity Funding when they are primarily interested in what Dirks and others did with his information. The attorneys for the plaintiffs in the trading cases will want to know whether the defendants acted on the inside information circulated about Equity Funding. Truth or falsity is not an issue. Materiality and non-public character are the only issues. See SEC v. Texas Gulf Sulphur Co., 2 Cir., 401 F.2d 833, 849. The details of how the fraud was accomplished and the identity of its perpetrators are irrelevant in the trading cases to both plain-

6. The plaintiffs in non-fraud cases allege that the "tippees" discovered the fraud, or rumors of the fraud, in March 1973 from Mr. Dirks and sold their stock before Mr. Dirks' discovery became public. In no case is it specifically alleged that Bankers Trust, Chemical Bank, Bristol, Fiduciary Trust or other such institutional investor defendants knew of the fraud before March 1973.

7. See In re Fourth Class Postage Regulations, 298 F.Supp. 1326 (Jud.Pan.Mult.Lit.

1969); In re Public Air Travel Tariff Litigation, 360 F.Supp. 1397 (Jud.Pan.Mult.Lit. 1973); In re Air Fare Litigation, 322 F. Supp. 1013 (Jud.Pan.Mult.Lit.1971). In the first case the common issue was the alleged unconstitutionality of the statute. In the two other cases the principal common issues were questions of law. See, Note, The Judicial Panel and the Conduct of Multidistrict Litigation, 87 Harv.L.Rev. 1001 (1974).

tiffs and defendants. The attorneys for the defendants in the trading cases will argue that their clients did not have inside information, did not act improperly, or what was known to them (and Dirks, perhaps) was common knowledge on the street, and besides the alleged information should not have influenced a reasonable purchaser. The nonexistence of the bogus insurance policies or the unexplained absence of $25 million in treasury bills from the company's bank box can hardly be contested. It is unrealistic and contrary to the objectives of Section 1407 to hold up the trading cases on the simplistic notion that sophisticated New York counsel in the trading cases will have to maintain the position that Equity Funding issued no bogus insurance policies. In short, although no attorney for a defendant in a non-fraud case is likely to make concessions against the interests of his client, it is a virtual certainty that the internal fraud, in which the trading defendants had no part, will never be a seriously disputed issue in the trading cases (or in the debenture and rescission cases).

The Panel's decision in In re Penn Central Securities Litigation, 325 F. Supp. 309, 311 (Jud.Pan.Mult.Lit.1971), is compelling authority for separate pretrial treatment of the fraud and the trading cases. In that litigation the Panel initially transferred to the Eastern District of Pennsylvania (Philadelphia) 17 actions growing out of the financial difficulties of the Penn Central Transportation Company. *See* In re Penn Central Securities Litigation, 322 F.Supp. 1021 (Jud.Pan.Mult.Lit.1971). Subsequently, the Panel decided that 12 cases involving the sale by Goldman, Sachs & Company of Penn Central Transportation Company's commercial paper should not be consolidated with the first 17 cases. The complaints in the second group of cases alleged misstatement and omission of material and non-public information by the seller, Goldman, Sachs & Co. These cases were transferred to the Southern District of New York. The Panel stated at 325 F. Supp. 309, 311 (Jud.Pan.Mult.Lit.1971):

The disputed question is whether these cases should be sent to Philadelphia for pretrial proceedings with the previously-transferred cases or transferred to some other forum. We conclude that the commercial paper cases are sufficiently different from the earlier cases that neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation would be served by their transfer to Philadelphia. These cases rest on a different set of primary facts than the earlier cases. They all turn primarily on the conduct and knowledge of Goldman, Sachs as a principal rather than the alleged insider trading, mismanagement and breaches of fiduciary duty within the Penn Central companies involved in the earlier cases. Of course, the full development of these cases may require investigation of factual areas covered in Philadelphia. Whatever efficiencies might result in these limited areas from transfer, however, would be outweighed by the need for separate treatment of the major portion of these cases and the difficulty which any transferee judge would face in attempting to meet such needs in an unduly large and complex group of cases. See, In re Antibiotic Drug Litigation, 320 F.Supp. 586 (Jud.Pan.Mult.Lit. 1971).

The majority fears the possibility of conflicting, inconsistent class determinations if, despite their disparity, all the cases in the present litigation are not transferred to a single judge. The fear is unfounded. While certain plaintiffs might eventually be class members in a fraud action and class members in a non-fraud action, dual membership of this sort will not lead to conflict or inconsistency.

The fears of the majority apparently stem from the provisions of Rule 23 which provide that judgment in a class action, whether or not favorable to the class, is binding upon all members of the

class. Fed.R.Civ.P. 23(c)(3). Thus, if the *same* claims are asserted in contemporaneous actions on behalf of overlapping classes, dual membership could result in conflicting, inconsistent judgments.

In cases where overlapping classes could result in inconsistent judgments in multidistrict litigation, class determinations should be made by a single judge. However, central administration of the fraud cases and the non-fraud cases for purposes of defining classes is not called for, since plaintiffs in the fraud cases and plaintiffs in the non-fraud cases assert different claims against different defendants.

The possibility of duplicative discovery on the underlying fraud issue may be minimized by practical measures which would not impair the just and efficient conduct of this litigation. Carefully limited discovery tailored to the peculiar requirements of the trading cases would be more efficient than general participation in the fraud suit proceedings. Such a limited program could easily be coordinated between the New York and California district courts so as to cause minimal disruption to California proceedings or to the Equity Funding trustee.

The "mixed cases" present no problem. Several plaintiffs, rather than bring two separate actions, chose to combine their claims in a single action, stating a claim for relief against Equity Funding for fraud and an additional, separate claim against the "tippees" for not disclosing the fraud after they discovered it. In every instance, the complaint clearly distinguishes the conduct charged against the trading defendants from that against Equity Funding and its personnel. Thus the "mixed" cases do not accuse the institutional investor defendants of having themselves participated in the fraudulent scheme. These defendants are accused, in "pure trading" and "mixed" cases alike, of nothing more than selling stock in March 1973 on the basis of rumors emanating from Dirks during that month. The disparate claims joined in the "mixed" cases would invite severance in any circumstances, even if this were not complex litigation.

### Debenture Actions

The claims by the debenture holders are on behalf of persons who purchased Equity Funding 5½ percent debentures in reliance on a December 1971 prospectus and registration statement. The litigation focuses on the managing underwriters, Bache & Co. and New York Securities Company, Inc., and the accountants for the prospectus. All are corporations based in New York. These actions concern the liability of third parties for allegedly misleading and false statements contained in the prospectus and registration statements. Again, the factual and legal issues (which bear on the scope of discovery) are entirely different from those in the actions based on Equity Funding's internal fraud.

The first case brought by a debenture holder was Untermeyer et al. v. Equity Funding Corporation of America. It was brought in the Southern District of New York (73 Civ. 1444). The Untermeyer plaintiffs and others who have brought the debenture actions strenuously oppose transfer of their litigation and, indeed, argue that all the Equity Funding cases, except the Chapter X proceedings, be transferred to New York. In terms of the availability of evidence to proceed with the action, particularly in the pretrial discovery stages, the plaintiffs must move primarily against the underwriters and the accountants. With both managing underwriters and both accounting firms based in New York, the Southern District of New York is the most convenient forum for parties and witnesses and for the efficient conduct of pretrial proceedings.

It is significant that in the debenture actions, as in the trading cases, discovery against Equity Funding should be relatively simple. The *Untermeyer* plaintiffs assert that any discovery against Equity Funding promises to be relatively simple. No more than interrogatories and requests for admissions may suffice. Documents could be copied and, if necessary, inspected, in Illinois

and California without the need to transfer the cases there.

Moreover, in considering transfer, the distinction between the debenture holders as creditors, and the stockholders, as equity holders, should be maintained. The two classes have conflicting interests. *See* In re Penn Central Securities Litigation, *supra*. Plaintiffs were holders of short-term promissory notes, not bondholders.

Bache & Co. and New York Securities Company, the debenture underwriters, are in New York; Haskins and Sells, accountant for Equity Funding Life Insurance, the Illinois insurer that sold the bogus policies, has its main offices in New York; Seidman & Seidman, Equity Funding's accountants, maintains its principal executive offices in New York and, to some extent, in Michigan.

### Rescission Actions

The rescission cases are class action suits on behalf of former stockholders of Bankers National Life Insurance Company. Equity Funding merged with Bankers National Life in October 1971. As a result of this merger, Equity Funding acquired Bankers Life, a New Jersey based insurer, and its subsidiary, Equity Funding Life Insurance Company of New York, a New York based insurer with combined insurance in force of more than two billion dollars. Substantially all of the negotiations centered in New York. Substantially all of the corporate officials and witnesses are in New York. Bankers National Life and Equity Funding of New York are the two most valuable assets of Equity Funding Corporation of America. The litigation relates in part to fraud allegedly perpetrated upon the Insurance Commissioner of New Jersey in inducing him to approve the merger and to the violations of conditions placed upon the merger by the New Jersey Commissioner and by the Superintendent of Insurance of New York. Not a single witness resides in California. Discovery will focus primarily upon documents sent to the stockholders of Bankers National Life and upon other matters leading to the merger which occurred in New Jersey and New York.

Moreover, First National City Bank, a defendant in two of the rescission actions wants the action to remain in New York for a valid reason. Equity Funding pledged all of its ownership of Bankers National Life to First National as security for loans. The plaintiffs challenge the validity of the lien. First National points out that any discovery on this issue is foreign to the other actions and that discovery will center in New York.

The rescission cases have nothing in common with the fraud cases. Transfer of these cases to California will serve only to delay their disposition.

### Conclusion

The scores upon scores of cases which for convenience, and despite their disparities, may be referred to as the *Equity Funding Litigation* involve widespread commercial frauds of a magnitude perhaps unprecedented in the history of the country. These frauds have had a substantial impact on many and diverse aspects of American business. To mix all of the distinctive groups of actions into one bundle because some of the litigation would not have occurred *but for* the internal fraud of Equity Funding's officers and directors is not serving the ends of just and efficient administration of the litigation. The trading or tippee cases, the claims of the debenture holders, and the rescission cases belong in New York where most of the parties to those cases, material witnesses, and relevant documents are located. In those actions the most significant questions of fact are of no interest to the litigants in the fraud cases; the central issues of fact in the fraud cases touch the other groups of cases only peripherally. There is not enough duplicative discovery to justify transfer in the interest of judicial economy or savings in pretrial time to the parties, and witnesses.

Salomon Brothers, which acted as principal or broker in all of the disputed

transactions, is located in New York. John W. Bristol & Co., Inc., which acted as agent in over 95 percent of these securities transactions and which is alleged to have acted improperly on inside information, is resident in New York. Boston Company Institutional Investors, Inc., which is alleged to have possessed inside information and to have acted improperly on it, is an affiliate of John W. Bristol & Co., Inc., is resident nearby in Boston, and is alleged to have transacted much of the business at issue in New York. Raymond Dirks, who is alleged to have passed material inside information to Bristol and Boston, is resident in New York. Almost all of the documentation surrounding the transactions in question is in New York. While the institutional sellers involved as defendants are located in many places throughout the country (many in New York), almost all of them customarily engage in investment activities through advisors, banks, and custodians in New York. Furthermore, it is expected that most of these institutions will play a rather passive role in the litigation and that the issue of their liability will depend primarily on the activities of their New York investment advisory agents. The vast majority of the parties have already retained counsel in New York and the New York lawyers in question have already for some time been deeply involved in the preparation and pursuit of these proceedings. A considerable amount of discovery has already taken place in New York including both documentary discovery and oral depositions.

The majority opinion raises a disturbing question as to the Panel's exercise of its statutory powers. Section 1407 and the Manual for Complex and Multidistrict Litigation came into being because of the brilliant performance of the voluntary Coordinating Committee in the *Electrical Equipment Cases*.[8] In a rela-

tively short time the Committee settled 25,000 claims in 1900 actions filed in 36 districts. Centralized management was essential *in that litigation.* The successful administrative management of the complicated *Electrical Equipment Cases* and the general success transferee judges have had under Section 1407 do not, however, raise a presumption that all litigating cousins, no matter how distantly related and independent they may be, must live together under one roof and under the control of one manager during pretrial proceedings.

The transfer of multiple actions to a single district has its built-in disadvantages. Some litigants must sacrifice their choice of forum and the control of their case through their attorney in the interests of judicial economy and the multidistrict litigants as a group. Congress therefore fixed limitations on the authority of the Panel to transfer under Section 1407: "Such transfers shall be made . . . for the convenience of the parties and witnesses and [to] promote the just and efficient conduct of such actions." The majority opinion virtually ignored the convenience standard and merely genuflected in the direction of the other statutory standards. Now we have a new judge-made standard for multidistrict litigation: If there is a background fact in one group of cases *but for* which there might not be litigation in another group or groups of cases, all the litigation must be consolidated or coordinated in the district most convenient for the pretrial of that "but for" fact. In effect, the majority has established the "but for" principle as the overriding criterion for transfer, notwithstanding the insignificance of the shared fact in pretrial proceedings in other distinctive groups of cases which will be held back by entanglement with the "but for" cases. This is an exercise of judicial power that finds no support

8. The Panel is fortunate in having the services of three distinguished judges who served on the Coordinating Committee: former Chief Judge Murrah and Chief Judges Becker and Robson. These three also were members of the first Board of Editors of the Manual for Complex and Multidistrict

Litigation (now known as the Manual for Complex Litigation) ; they continue to serve on the Board. Judge Lord has had vast experience as a transferee judge, notably in the Penn Central Securities Litigation. Only with great reluctance do I disagree with these veterans.

in Section 1407 or in our previous decisions. I would hold that here there is no substantial commonality of facts raising significant factual issues. Transfer of non-fraud actions for consolidation or coordination with the fraud actions in the "but for" forum ignores the statutory standards and will defeat the purposes of Section 1407.[9]

---

**9.** "Unless there is substantial commonality of the fact questions presented, coordinated and consolidated proceedings can serve no purpose other than to produce chaos and to slow and complicate the pre-trial proceedings in the various actions." Kaminsky, The Judicial Panel on Multidistrict Litigation: Emerging Problems and Current Trends of Decision, 23 Syracuse L.Rev. 817, 830

(1972). At least one commentator has noted that, "A dispute has arisen within the Panel, for example, on the substantiality of common factual questions sufficient to justify transfer". Comment, 39 U. of Chi.L.Rev. 588, 594, n. 36 (1972).