In re EQUITY FUNDING CORPORA-
TION OF AMERICA SECURITIES
LITIGATION.

CHEMICAL BANK, as Indenture Trustee,
Robert E. Pittis, Marie Claire Pittis, Max
Newmark and Elaine Newmark, Appel-
lants,

v.

Sylvia CONFINO et al., as Representa-
tives of the Plaintiff Classes,
Appellees.

No. 77–3735.

United States Court of Appeals,
Ninth Circuit.

Sept. 12, 1979.

Roger A. Ferree (argued), Los Angeles, Cal., for appellants.

Marshall B. Grossman (argued), Schwartz, Alschuler & Grossman, Jack Corinblit, Los Angeles, Cal., for appellees.

Before BROWNING, BARNES and ELY, Circuit Judges.

BARNES, Senior Circuit Judge:

This is an appeal from the district court's order approving a plan of allocation of settlement funds in the Equity Funding Corporation of America Multi-district Securities Litigation. The major issue centers on the district court's decision to reduce the "net adjusted loss" of each claimant by the value of shares and cash received by such claimants in a related Chapter X reorganization proceeding.

## I. FACTS

The underlying litigation arose from the securities fraud perpetrated through the Equity Funding Corporation of America ("EFCA") and its related companies.[1] On

---

1. The background and description of the EFCA fraud operations have been the subject of numerous books, articles, and reports as well as several judicial opinions. *See* generally *In re*

April 2, 1972,[2] reports of the alleged fraud were published in the press and numerous investor suits were subsequently filed throughout the country.[3] Most of the actions were transferred to the Central District of California for consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407. *In re Equity Funding Corporation of America Securities Litigation*, 375 F.Supp. 1378 (Jud.Pan.Mult.Lit.1974).

On April 5, 1973, EFCA's petition for protection and reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. §§ 501 *et seq.*, was approved. The district court judge presiding over the EFCA reorganization proceeding (the "Reorganization Court") enjoined and stayed the commencement or continuation of all actions against EFCA pursuant to 11 U.S.C. § 516(4). The district court presiding over the consolidated multi-district securities litigation (the "MDL Court") thereafter dismissed without prejudice the claims asserted against EFCA, finding such claims to be within the exclusive jurisdiction of the Reorganization Court pursuant to 11 U.S.C. § 11, read in conjunction with 11 U.S.C. §§ 502, 506(1) and 596. The securities and fraud claims against EFCA were subsequently asserted in the reorganization proceeding.

In December 1975, the Reorganization Court approved the bankruptcy trustee's plan of reorganization (the "Reorganization Plan"). *In the Matter of Equity Funding Corporation of America*, 416 F.Supp. 132, 156 (C.D.Cal.1975). Said Plan divided EFCA's creditors into the following nine categories:

Class 1 —Tax Creditors

Class 2 —Wage Claimants

Class 3 —Secured Lessors

Class 4 —Secured Creditors—Revolving Credit Agreement

Class 4.1—Secured Creditors—Bankers Trust Company and Israel Discount Bank

Class 5 —Bankers Rescission Claimants

Class 6 —General Unsecured Unsubordinated Creditors

Class 6.1—General Unsecured Unsubordinated Creditors—Small Trade Creditors

Class 7 —Holders of Subordinated Debt Instruments

Class 8 —Fraud Claimants

Class 9 —Equitably Subordinated Claims

*Id.* at 147. Four of the nine classes (1, 2, 3 & 6.1) were paid in full pursuant to relevant provisions of the Bankruptcy Act or because their claims were relatively small in size. Class 4.1 creditors received partial payment in cash on the secured portion of their claims with the balance showing in Class 6. The ninth category was held not to be on a parity with the other classes, and due to the insufficiency of the available assets to satisfy the claims of the other classes, creditors in the ninth category were not allowed any recovery. As to the remaining categories, the Reorganization Plan devised a schedule which included the distribution of cash and notes and stock in EFCA's successor, Orion Capital Corporation ("Orion"), to the creditors in varying percentages of their claimed losses. The Orion Stock was valued at $11.02 per share by the Reorganization Court. The schedule of distribution to the classes was as follows:

---

*Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1313 ns. 1–4 (C.D. Cal.1977), and references cited therein. A most thorough and readable account is provided in the *Report of the Trustee of Equity Funding Corporation of America Pursuant to Section 167(3) of the Bankruptcy Act [11 U.S.C. § 567(3)]*, October 31, 1974 (second printing) ("Trustee's Report") submitted as an exhibit herein.

2. In March 1973, trading in EFCA stock was halted by the New York Stock Exchange and the Securities and Exchange Commission. EFCA stock had been publicly traded since 1964.

3. More than 110 class action complaints and more than 15 private actions relating to the EFCA fraud were eventually filed against a total of more than 260 named defendants.

## DISTRIBUTION UNDER THE PLAN

| | No. of Shares | % of New Company | Value of Recovery in Millions | Amount of Claims in Millions | Percent Recovery |
|---|---|---|---|---|---|
| Class 4 | — | — | $ 42.8 | $ 66.1 | 64.8 |
| Class 5 | 1,120,000 | 14.1 | 12.3 | 35.8 | 34.4 |
| Class 6 | 3,062,448 | 38.7 | 33.8 to 35.2 | 44.4 | 76.1 to 80 |
| Class 7 | 1,834,812 | 23.2 | 20.2 | 64.2 | 31.5 |
| Class 8 | 1,900,000 | 24.0 | 20.9 | 170.0 | 12.3 |
| | 7,917,260 | 100.0 | $130.0 | $380.5 | |

*Id.* at 154.

■ Class 6 creditors in the reorganization proceeding consisted primarily of holders of notes and debentures issued or guaranteed by EFCA. Class 8 creditors included EFCA shareholders at the time of the reorganization proceeding and those persons or entities who lost money from trading in EFCA stock or debt instruments. Although Class 6 creditors, as unsecured creditors, would normally be given priority over the Class 8 defrauded shareholders, the Reorganization Court approved the compromise in the Reorganization Plan which allotted a 12.3% recovery to Class 8 creditors, despite the absolute priority rule,[4] in recognition of two factors: (1) there was some authority at the time of the court's decision that a fraud claim, even if based on stock acquisition, was on a parity with general unsecured claims in a reorganization proceeding, *see e. g. In re Four Seasons Nursing Center of America, Inc.,* 472 F.2d 747, 749–50 (10th Cir. 1973),[5] and (2) if the Class 8 creditors succeeded in their claims, the available share of recovery to Class 6 creditors would be substantially reduced.

In July 1975, class certification of the plaintiff class and subclasses was tentatively ordered by the MDL Court in the securities litigation. On March 26, 1976, the defendant classes were certified. On January 31, 1977, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), a notice of the proposed settlements and the class action determination ("Notice") was sent to the members of the plaintiff classes. Part Two of the Notice stated that a hearing (the "Settlement Hearing") would be held on April 29, 1977 before the MDL Court to determine the fairness and reasonableness of each of the proposed settlements. The proposed settlements were itemized as follows:

4. The absolute priority rule applies to proceedings under Chapter X of the Bankruptcy Act. *Group of Institutional Investors v. Chicago, M., St. P. & Pac. R. R.,* 318 U.S. 523, 546, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *In re Matter of Penn Central Transportation Co.,* 596 F.2d 1102, 1110 (3rd Cir. 1979). The rule is described in 6A *Collier on Bankruptcy* ¶ 11.06, at 210–11 (14th ed. 1977), as follows:

> Under the absolute priority rule, a plan is not "fair and equitable" unless it provides participation for claims and interests in complete recognition of their strict priorities and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Any arrangement by which a junior class receives values allocable to a senior class "comes within judicial denunciation." Beginning with the top-most class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate. Thus the principle is applied as between . . unsecured creditors and stockholders. . . [Footnotes omitted.]

5. We note, without endorsing or rejecting the decision, that the Second Circuit has recently reaffirmed the majority rule stating that claims of defrauded shareholders are to be subordinated to those of ordinary general creditors by a court in a Chapter X proceeding. *In the Matter of Stirling Homex Corp.,* 579 F.2d 206, 212, 215 (2d Cir. 1978), *cert. denied sub nom. Jezarian v. Riache,* 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979).

| A. Settling Defendants | Amounts to be Paid |
|---|---|
| Wolfson, Weiner & Co., Wolfson, Weiner, Ratoff & Lapin, Seidman & Seidman, Haskins & Sells, and certain of their present and former partners, employees and agents | $39,000,000 |
| Bache, Halsey Stuart, Inc. (formerly known as Bache & Co.), and New York Securities Co. Incorporated | $ 3,467,500 |
| Joseph Froggatt & Co. and certain of its former partners | $ 3,000,000 |
| Milliman & Robertson, Inc. | $ 3,000,000 |
| The Estate of Michael R. Riordan and certain donees of and beneficiaries under the Will of Michael R. Riordan | $ 2,000,000 |
| Pennsylvania Life Company and certain of its subsidiaries, directors, officers and employees | $ 5,000,000 |
| Certain former directors, officers and employees of EFCA and its subsidiaries | $ 227,381 |
| Dishy, Easton & Co. | $ 50,000 |
| Trading Defendants | $ 4,000,000 |
| B. The Trustee of EFCA | $ 250,000 |
| Total | $59,994,881 |

*In re Equity Funding Corp. of America Securities,* 438 F.Supp. 1303, 1320 (C.D.Cal. 1977).

Subpart P of Part Two of the Notice described a proposed plan of allocation of the proceeds of the settlements submitted to the MDL Court by representatives of the counsel for the plaintiff classes (the "Plan of Allocation"). According to the Plan, all members of the plaintiff classes would "share and share alike" in the proceeds of the settlements based on their "net adjusted losses" regardless of the type of securities upon which their claims rested. In addition, paragraph 52 of Subpart P of the Notice stated that:

52. The Plan of Allocation provides that the net adjusted losses of each class member will be reduced by all cash, if any, received by the class member from the Trustee pursuant to any agreement or compromise with the Trustee or pursuant to the Amended Plan of Reorganization. The Plan of Allocation further provides that the Court will be asked to decide at the April 29, 1977 Settlement Hearing or at such other hearing then set by the Court (i) the question whether shares of the common stock of Orion Capital Corporation, EFCA's successor, received by class members in connection with the EFCA reorganization proceedings are to be taken into consideration as a "gain" in calculating the net losses sustained and, if so, what value shall be placed upon such shares and (ii) what value shall be placed upon any non-cash consideration given for EFCA securities. The Plan of Allocation itself shall be submitted to the Court for approval at the April 29, 1977 Settlement Hearing following hearing on the proposed settlements.

Prior to the Settlement Hearing, appellants Robert E. Pittis, Marie C. Pittis, Max Newmark and Elaine Newmark ("Individual Appellants"), who were at all pertinent times herein holders of 9½% EFCA debentures, and Chemical Bank, as Indenture Trustee on behalf of the 9½% debentureholders, objected to the Plan of Allocation only insofar as it proposed to offset the cash and Orion stock received by the debentureholders in the Chapter X proceeding against their recovery in the securities settlement.[6] As debentureholders, the Individ-

---

**6.** In a letter dated January 28, 1977 to holders of EFCA 9½% debentures, Chemical Bank made the following statements:

Following the hearing on the proposed settlements and compromises the Court will determine whether and, if so, to what extent,

ual Appellants had been Class 6 creditors in the reorganization proceeding and had received a 76.1% to 80% recovery therein. Those others in the MDL plaintiff classes, who were not note or debentureholders but merely EFCA stockholders, had been Class 8 creditors in the reorganization proceeding and had received only a 12.3% recovery. Thus, the proposed offset would have a relatively greater impact upon the participation of the debentureholders in the securities settlement fund as opposed to shareholders.

Also prior to the Settlement Hearing, counsel representing all certified plaintiff class representatives, including debentureholders, unanimously agreed that, for purposes of the Plan of Allocation, they would recommend a figure of $8.00 per share to be ascribed to the Orion stock ("Orion Valuation Agreement"). That recommendation did not represent a concession by the debentureholders that the offset was proper but merely a recognition that extensive delay caused by squabbling over the per share value of Orion stock would be counterproductive and detrimental to all of the plaintiffs.

On September 30, 1977, the MDL judge issued his Findings of Fact and Conclusions of Law. He approved the Plan of Allocation and the Orion Valuation Agreement. In paragraph 17 of the Findings of Fact, he specifically found the cash offset proposed in the Plan of Allocation to be "fair and reasonable". In paragraph 18, it was noted that the Plan provided that the MDL Court would determine whether the Orion stock received by the claimants should be considered as part of the offset. The MDL judge in paragraph 32 found the stock offset at the rate of $8.00 per share to be "fair and reasonable".

In the extensive Findings of Fact, the MDL judge articulated the factors upon which he based his approval of the offset provision raised in the Plan of Allocation. Initially, as to the question of whether an offset should be utilized at all, it was noted that:

30. The claims asserted in the Chapter X proceedings by purchasers of securities issued by EFCA or its subsidiaries, including purchasers of EFCA debentures, and the claims asserted in MDL Docket No. 142 by such persons and entities as members of the plaintiff classes arise out of the same facts, transactions and events, namely, the acquisition by such persons and entities of securities issued by EFCA or its subsidiaries.

31. The losses incurred by purchasers of securities issued by EFCA or its subsidiaries, including purchasers of EFCA debentures, which form the basis of their claims in the Chapter X proceedings are the same losses which form the basis of their claims in MDL Docket No. 142, namely, losses based upon the acquisition by such persons and entities of securities issued by EFCA or its subsidiaries. (Findings of Fact, paragraphs 30 and 31).

The MDL judge recognized that the offset provision would have more of an adverse effect upon claimant debentureholders as they had recovered more in the reorganization proceeding. (Findings of Fact, paragraph 29). In justifying that result, the MDL judge initially observed that the share and share alike portion of the Plan of Allocation was a compromise reached by counsel for the plaintiff classes which helped to resolve the administrative nightmare posed by the problem of allocating the proceeds of the settlement among the class

the portion of the settlement fund otherwise payable to each claimant should be reduced by the value of shares of Orion Capital Corporation received by such claimant from the estate of the Company. Since the claims of Debentureholders against the estate of the Company have been or will be satisfied primarily by distribution of shares of stock of

Orion Capital Corporation, the Court's resolution of these questions could have a significant impact upon the total recovery of Debentureholders from the settlement fund. Debentureholders are entitled to appear, and be heard, either personally or through their counsel, at this hearing, which is scheduled for April 29, 1977.

claimants. In a previous order the MDL Court had held that a class member could only state a claim for relief against defendants who were found responsible for violations of the law occurring prior to the date of such class member's acquisition of the securities upon which his claim was based. Consequently, if the MDL Court had not adopted the share and share alike provision of the Plan of Allocation, it would have been required to weigh the strengths and weaknesses of the claims of each class member against each of the settling defendants and take into consideration the date of acquisition of the securities acquired by the member in order to determine how much each class member should receive from the proceeds of settlement. (Findings of Fact, paragraph 8). The difficulty of such a task was compounded by the fact that many class members had acquired more than one type of security. The feasibility of making those determinations was further put into doubt by the fact that certain of the settling defendants agreed to participate only in a joint settlement and not individually. The group of settling accountant defendants, which contributed the largest amount to the settlement fund ($39,000,000.—65% of the total received), employed such a procedure and thus the breakdown of contribution as to those defendants was unavailable to the MDL Court or to the claimants. In light of such a settlement, it would have been impossible to allocate the $39,000,000 recovery paid by the accountant defendants among the various classes of claimants based upon an evaluation of the strengths and weaknesses of their claims against each of those settling defendants. (Findings of Fact, paragraph 9).

The share and share alike provision resulted in the treatment of all claims of the classes on an equal basis. However, the MDL Court recognized that the claims of debentureholders were not as strong as other plaintiff classes in regards to a number of the major settling defendants. In adopting the stock offset provision, the court attempted to resolve that inequity by restricting the debentureholders' participation in the settlement fund to a greater degree than other classes.

As stated by the MDL Court:

By way of further example of the overall fairness of the Plan of Allocation, under the Plan of Allocation purchasers of EFCA's 9½% Debentures will participate in the Accountants' Settlement Fund and other settlement funds on equal terms with purchasers of other EFCA securities, even though the original issue of such 9½% Debentures took place under a prospectus dated December 9, 1970, prior to the time that Seidman & Seidman had any connection with EFCA, even though said prospectus contained a financial statement by EFCA for the year ended December 31, 1969, with respect to which the liability of Haskins & Sells was apparently problematical, even though the maximum primary insurance available to the Wolfson, Weiner defendants apparently did not exceed $10,000,-000 as to which all classes of claimants apparently could state valid claims, even though the Joseph Froggatt & Co. defendants had no connection with EFCA until October 1971, when EFCA merged with Bankers National Life Insurance Company, even though substantial elements of certain of the claims alleged against the Penn Life defendants are based on conduct occurring after December 9, 1970, and even though the purchasers of 9½% debentures shared their claims against the Underwriter defendants with purchasers of the 5½% Debentures. In view of the participation of purchasers of the 9½% Debentures in settlement funds as to which they may have no claim, or claims in amounts less than those provided for under the Plan of Allocation, it is hereby found to be fair and just that the recoveries of purchasers of 9½% Debentures in the Chapter X Proceedings be taken into account in the manner provided for in the Plan of Allocation in determining the share of pur-

chasers of 9½% Debentures in such settlement proceeds. (Findings of Fact, paragraph 11).

In addition, the MDL Court found that Chemical Bank lacked standing to object to the Plan of Allocation or any aspect thereof because it was not a member of the plaintiff classes, nor was it a claimant against any of the settling defendants. (Findings of Fact, paragraph 46).

On October 3, 1977, the MDL Court issued its order approving the Plan of Allocation and Orion Valuation Agreement and directing the effectuation of said plan including the offset provision.[7] This appeal arises from that order.

## II. DISCUSSION

Appellants raise only one issue before this court, i. e., whether the MDL Court erred in ordering that the claims of class members against the settlement fund be offset by their prior receipt of cash and/or stock pursuant to a related reorganization proceeding. Appellants did not object to any other aspect of the Plan of Allocation or to the $8.00 per share valuation figure itself. Prior to reaching that main controversy, however, three preliminary issues must be dealt with.

### A. *Standing of Chemical Bank*

Chemical Bank is not a member of the plaintiff classes in the MDL securities litigation, nor is it otherwise a claimant to any portion of the settlement fund. A question therefore arises as to its standing to object to the Plan of Allocation and to appeal from the order of the MDL Court approving the offset provision of said Plan.

Chemical Bank is the indenture trustee for the 9½% EFCA debentureholders.[8] As such, it had a right to be, and was, heard in the Chapter X reorganization proceeding. 11 U.S.C. § 606; *Mosser v. Darrow,* 341 U.S. 267, 270–71, 71 S.Ct. 680, 95 L.Ed. 927 (1951). Nevertheless, we have not been referred to, nor have we found, any provision of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa *et seq.,* or any other federal statute, which would entitle Chemical Bank to have standing in the MDL securities litigation.[9] No case on this point has been located.

Chemical Bank argues that it is the representative and/or fiduciary of the 9½% debentureholders. However, its status as a representative of said debentureholders was only established as to the Chapter X proceeding. In the MDL securities litigation, the debentureholders were represented by court appointed class representatives and their counsel. Because it was not a member of the class of debentureholders, Chemical Bank could not be a representative in the class action.[10] 3B Moore's Federal Practice ¶ 23.04[2] at 23–122 (1978). Neither Chemical Bank nor any member of the

---

**7.** Said order also expressly directed the entry of the order as a final judgment pursuant to Rule 54(b) of the FRCP.

**8.** The First Amended Unified and Consolidated Complaint filed in the MDL securities litigation (the "MDL Complaint") listed two debenture issues. The first was a 9½% debenture offered in a prospectus dated December 6, 1970. The second was 5½% subordinated debenture issued in December 1971. *In re Equity Funding Corp. of Amer. Sec. Litigation,* 416 F.Supp. 161, 172 (C.D.Cal.1976).

**9.** 15 U.S.C. § 77qqq(a)(2) would authorized the indenture trustee to file necessary papers in order to have the trustee's claims or those of the indenture security holders allowed in any judicial proceeding "relative to the obligor upon the indenture securities". Because all claims against EFCA, the "obligor" herein, were dismissed from the MDL securities litigation, § 77qqq(a)(2) does not support Chemical Bank's standing in this case.

**10.** Our conclusion is further supported by the fact that in Count X of the MDL Complaint, Chemical Bank was charged by the 9½% debentureholders with breach of federal securities laws, including the Trust Indenture Act. *In re Equity Funding Corp. of Amer. Sec. Litigation,* 416 F.Supp. 161, 174 (C.D.Cal.1976). Even though the claims against Chemical Bank were dismissed pursuant to an agreement reached with plaintiffs' counsel prior to the settlement with the other defendants, such a charge in the complaint, we believe, puts a sufficient taint on

9½% debentureholder class ever objected to the court appointed class representatives or charged that there was a lack of adequate representation by the representatives.

Consequently, we agree with the MDL Court that Chemical Bank lacks standing to object to, or to appeal from the Plan of Allocation or its approval by the court below. *Warth v. Seldin,* 422 U.S. 490, 498–500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, the Individual Appellants, as debentureholders and members of the plaintiff class, clearly had standing to object for purposes of this appeal. We therefore now turn to their arguments.

B. *Adequacy of the Notice Received*

█ Appellants state that, while they did receive the Notice of the Settlement Hearing, they did not receive any communication regarding the Orion Valuation Agreement prior to the hearing. Because that latter agreement delineated the compromise among counsel for the plaintiff classes which was later approved by the MDL Court, appellants argue that there was a failure to adequately notify the classes with respect to the offset issue. We find that contention to be without merit.

In *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1177 (9th Cir. 1977), this Court described the applicable standard for Rule 23 notices as follows:

> Notice in a class suit must present a fair recital of the subject matter and proposed terms and given [sic] an opportunity to be heard to all class members. [Emphasis added].

See *In re Gypsum Antitrust Cases,* 565 P.2d 1123, 1125 (9th Cir. 1977), when that standard was applied in the context of a Rule 23(e) notice.

Paragraph 52 of the Notice informed class members that the Plan of Allocation provided for the offset of cash received by the class member from the reorganization proceeding. In addition, it stated that the MDL judge would be presented with, and decide, the question of whether the Orion shares should also be offset and, if so, by what amount. Thus, the appellants were made aware that the offset and valuation questions were to be resolved at the Settlement Hearing. The Notice should not have in any way lulled the appellants into inactivity on those points. Indeed, in the January 29, 1977 letter to the 9½% debentureholders, Chemical Bank had warned them that the resolution of the above issues "could have a significant impact upon the total recovery of Debentureholders from the settlement fund." The debentureholders already knew that the Reorganization Court had previously approved a figure of $11.02 per share for the Orion stock.

We find the Notice herein to be sufficient under this Court's standard articulated in *Holiday Magic, Inc., supra; Accord, Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 176, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Miller v. Republic Nat. Life Ins. Co.,* 559 F.2d 426, 429 (5th Cir. 1977); *Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Clearly, the Notice informed the appellants of the subject matter and terms of the proposed settlements and Plan of Allocation at the time the Notice was sent out. The fact that, subsequently, a tentative compromise was reached on one of the issues to be considered at the Settlement Hearing did not make the Notice defective since the compromise was subject to the court's approval at the Settlement Hearing. Appellants were aware that the MDL Court would decide the issue of valuation at the Settlement Hearing. They knew that the Orion Stock had never reached the $11.02 per share figure, which the Reorganization Court had

Chemical Bank's standing to represent debentureholders in the securities litigation in any

capacity when there has already been class representatives appointed by the court.

given it [11] on the exchange where it was publicly traded in the period from its issuance to the time of the settlement hearing. Thus, the appellant should have known that the range of valuation for purposes of the offset would be from zero, if the offset provision was rejected, to $11.02, if the Reorganization Court's figure was adopted. The compromise figure of $8.00 per share was within that range.

We further note that on April 19, 1977, appellants filed a memorandum with the MDL Court wherein they argued against the adoption of offset provision. In said memorandum, appellants presented numerical data showing the effect upon 9½% debentureholders if the offset were rejected or if the offset were approved at valuations of $11.02, $8.00 and $6.00 per share. Thus, appellants had shown that they were cognizant of the ramifications if an $8.00 per share valuation for Orion stock was adopted by the MDL Court and demonstrated their ability to marshall arguments against such a move at the Settlement Hearing. Therefore, despite any claimed defect in the Notice, appellants have suffered no prejudice because of it.

C. *Standard of Review*

■ A district court's approval of a class action settlement and plan of allocation of proceeds among plaintiff classes is to be reviewed under the abuse of discretion standard. *Holiday Magic, Inc., supra,* 550 F.2d at 1178; *State of West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2nd Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Norman v. McKee,*

431 F.2d 769, 774 (9th Cir. 1970), *cert. denied, I.S.I. v. Myers,* 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971); 3B Moore's Federal Practice ¶ 23.80[4] at 23–518 and 519 (1978). Appellants contend that the offset issue was presented as a question of law for the MDL Court and therefore the applicable standard of review of its decision is more stringent than the standard applied for an alleged abuse of discretion, *i. e.* this Court can reverse for mere error. *Cf., Helland v. Metropolitan Life Insurance Co.,* 488 F.2d 496, 497 (9th Cir. 1973).

According to paragraph 52 of the Notice, the Plan of Allocation itself provided for an offset to "the net adjusted losses of each class member . . . by all cash, if any, received by the class member" under the Reorganization Plan or any other agreement with the EFCA Trustee. Therefore, the Plan did in fact contain an offset provision contrary to appellants' reading of it.[12] The issue which was left for the MDL Court to decide, but which was originally raised in the Plan of Allocation, was whether the Orion stock was also to be taken into account as part of the proposed offset.

■ Because the offset provision was initially provided for within the Plan of Allocation, there are really two separate questions involved herein. First, in response to appellants' arguments, it must be determined whether the use of cash and stock received in a bankruptcy action as an offset in determining the distribution of settlement funds in a separate but related securities class action violates any applicable law. That is a question of law and accordingly the standard of review is whether the lower

11. We do note that Orion stock has surpassed the $11.02 per share figure on occasion since that time.

12. Appellants, in the oral argument before this court, stated that the offset issue was not originally raised in the Plan of Allocation but solely placed before the court in the Settlement Hearing as a question of law. Paragraph 52 of the Notice and paragraph 18 of the Findings of Fact clearly indicate to the contrary. Indeed, as noted by the appellants themselves in their

memorandum to the MDL Court filed on April 19, 1977:

Petitioners oppose the proposed Plan of Allocation insofar as it offsets cash received by the Debentureholders in the Chapter X Reorganization proceedings; furthermore, Petitioners oppose any offset against the claims of Debentureholders in this proceeding by reason of their receipt under the Amended Plan of Reorganization of shares in Orion Capital Corporation.

court erred in deciding that the use of such an offset was permissible. Second, the MDL Court's approval of the particular offset provision described in the Plan of Allocation must also be examined. Such an examination is a component of the review of the MDL Court's approval of the Plan of Allocation for which the standard of review is whether the MDL Court abused its discretion.

### D. *Offset*

#### 1. Validity of the Offset as a question of Law.

Appellants have cited no cases and we have not located any precedent which hold that, under any federal statute or applicable rule of law, it would be *per se* erroneous for a district court to offset a class member's recovery in a securities settlement fund by the amount of cash and stock he received pursuant to a plan of reorganization in a related but separate bankruptcy action. Indeed, we have found nothing remotely touching on this issue at all.

In the present situation, despite the fact that counsel for the plaintiff classes had obtained one of the largest monetary settlements or judgments in the history of securities class actions, the settlement fund was not sufficient to satisfy the claimed losses of all of the class members. Still, the settlement contributions from each of the defendants were adjudged to be fair and reasonable by the MDL Court and the appellants have not questioned the validity of the amounts contributed, or their fairness. A problem therefore arose as to the equitable allocation of the large settlement fund among the even larger claims of the various class members.

■ In responding to the problem, the MDL Court properly observed that those claimants who had participated in the reorganization proceeding had already received a varying degree of partial recovery for those losses which formed the basis of their claims in the securities litigation. Class 8 claimant-shareholders in the Chapter X proceeding had participated in the Plan of Reorganization because of their standing as victims of fraud and violations of the Securities Acts by EFCA. *See Matter of Equity Funding Corp. of America*, 416 F.Supp. 132, 151 (C.D.Cal.1975). Their claims in the securities litigation were founded on the same underlying theories, *i. e.* fraud and violations of the Securities Acts by the MDL defendants. More importantly, their damages rested upon the same losses which they claimed in the reorganization proceeding, *i. e.* those resulting from their acquisition of EFCA securities. Class 6 claimant-debentureholders had received cash and stock under a different theory of recovery in the reorganization proceeding. Nevertheless, like the claimant-shareholders, the damages which the debentureholders sought in the securities litigation were founded upon their acquisition of the debentures for which they had received substantial remuneration in the Chapter X proceeding. Given the above situation, we do not find it *per se* erroneous for the MDL Court to approve and adopt an offset provision which considered the prior recovery by claimants in a related bankruptcy proceeding in order to fairly allocate the settlement funds among class members in the securities litigation.

Appellants have raised three arguments against any use of an offset of a prior bankruptcy recovery. (1) They contend that the offset violates the "integrity" of the Chapter X proceeding because the proportionately greater recovery which the debentureholders obtained pursuant to the bankruptcy laws and with the approval of the Reorganization Court is turned to their disadvantage in the securities settlement. (2) It is argued that the federal securities laws do not permit such an offset (although no particular statute is cited), and the cases referred to by appellants are not applicable herein. Reference is made to purportedly general rules (a) that the measurement of fraud damages is determined at the time such damages occur and subsequent unre-

lated fluctuations in the value of the securities are irrelevant, (b) that a judgment against one joint tortfeasor is not a bar to an action against another for the same damages although only one satisfaction may be obtained, and (c) that the post-reorganization debt recovery of a creditor does not reduce his fraud claim against a third party. (3) Because recoveries in a civil proceeding would supposedly not be offset in a subsequent bankruptcy proceeding, appellants assert that the mere fortuity of the Chapter X reorganization's being resolved first should not act to their detriment and adversely affect their recovery in the securities settlement.

As to the first argument that the integrity of the Chapter X proceeding is compromised by the offset provision, we find that the MDL Court in applying the offset did not seek, nor was the result in fact, to alter or affect the Reorganization Plan. Rather, the MDL Court approved the use of the offset as a means of determining an equitable distribution of the securities settlement funds among the various claimants in the securities class action. The cash and stock which the debentureholders and others had received in the reorganization proceeding were not reduced or modified by the MDL Court. Thus, the results of the bankruptcy proceeding were not directly disturbed.

In order to find some detrimental, indirect effect upon the integrity of the bankruptcy proceeding, we would be forced to conclude that the appellants were denied a fair share of the securities settlement solely because of their prior bankruptcy recovery. We cannot and do not reach such a conclusion herein. The offset provision was applied to all class members, including shareholders, who received any cash or stock from the reorganization proceeding. Debentureholders were not singled out for different treatment. Consequently, what appellant-debentureholders are really objecting to is not an offset provision *ipso facto*, but rather the fact that the offset provision used by the MDL Court had a greater ad-

verse effect upon their recovery than on the other class members. The real focus of inquiry is not upon an offset provision in general, but whether the MDL Court had a sufficient and valid reason for curtailing the debentureholders' participation in the settlement fund to a greater degree than the other claimants. As discussed below, the debentureholders' failure to share in the settlement proceeds on an equal basis with the other class members stems from the MDL Court's appraisal of their entitlement to the settlement funds as compared with the other claiming classes.

Appellants' second contention that their recovery in the bankruptcy proceeding was used to deflate their securities claims mistakes the steps by which the MDL Court reached its decision herein. Appellants have emphasized the continued liability of joint tortfeasors in securities cases despite increases in the value of the stock, partial recovery from one joint tortfeasor, or the post-reorganization debt recovery by a creditor who also alleges fraud or securities violations in regards to the acquisition of debentures. However, the offset provision was not applied for the purpose of lowering the claims of debentureholders in order to benefit any joint tortfeasor. Rather, the use of the offset was for the purpose of allocating the available settlement funds among the various claimants. We therefore find the appellants' arguments on these issues to be irrelevant to the situation before us. Moreover, the MDL Court did not find that the debentureholders had an equal claim to the settlement fund as other plaintiff classes. Thus, its decision to more severely limit the debentureholders' participation in the settlement was based upon a comparison of those claims with the other classes rather than a mere evaluation of the debtentureholders' general claims by itself.

Appellants' final argument, that no offset would have been made in the bankruptcy proceeding if the securities litigation had been resolved first, is essentially a *non sequitur*. The decision to effectuate an offset

did not arise from the mere fortuity that the bankruptcy proceeding had already been decided by the time the MDL Court was faced with the problem of allocating the settlement funds. The court's approval of the offset resulted from the fact that the claims of the class members far exceeded the sums in the settlement fund and from the court's conclusion that the debenture-holders' claims were inferior to those of the other classes as regards the settlement proceeds as a whole. Given those two elements, an offset provision or some other form of reduction would have been applied to decrease the debentureholders' participation in the settlement fund notwithstanding the status of the related bankruptcy proceeding.

### 2. Propriety of the Offset.

■ The MDL Court's approval of the cash and stock offset provision raised in the Plan of Allocation was a component of its duty to insure the equitable distribution of the settlement proceeds. *Cf., Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978). As noted above, the applicable standard of review is whether the MDL Court abused its discretion in so approving the offset provision.

After the defendants had made their settlement offers which counsel for the plaintiff classes had found to be acceptable, the MDL Court was initially faced with the almost impossible task of determining the distribution of the settlement fund among the myriad claimants. Such a determination would have required the court to weigh the strengths and weaknesses of the claims of each class member against each of the settling defendants taking into consideration the dates of acquisition of the securities. That already difficult job would have been rendered a practical impossibility by the fact that some of the settling defendants agreed to and did participate only in a joint settlement wherein the breakdown of the contribution from each of the individual defendants was not disclosed. That procedure was adopted by the largest group of settling defendants who, in total, contributed 65% of the settlement proceeds.

The Plan of Allocation presented a compromise among the classes of claimants which resolved that initial dilemma. The Plan contained a share and share alike provision by which the claimants would participate in the settlement fund in proportion to their net adjusted loss, as defined by the Plan, regardless of the type of securities acquired and the date of acquisition.

However, as recognized within the Plan of Allocation and by the MDL Court, the share and share alike provision favored the debentureholder claimants whose claims against many of the major defendants were not on a parity with those of the other plaintiff classes. The largest settling group of defendants consisted primarily of four accounting firms and some of their present and former partners, employees and agents. The liability of defendants Wolfson, Weiner & Co. and Wolfson, Weiner, Ratoff & Lapin (co-partnerships collectively referred to herein as "Wolfson") to the debentureholders was not restricted by the MDL Court although the maximum primary insurance available to Wolfson would not have exceeded $10,000,000. Conversely, the liability of defendant Seidman & Seidman to the debentureholders had previously been held by the court to be limited by the fact that it had no connection with EFCA until it merged with the Wolfson firms in or about February 1972, a date after which the EFCA debentures had already been offered to the public. (*See* footnote 8, *supra*). Likewise, the MDL Court considered the liability of defendant Haskins & Sells to be "apparently problematic", the latter having been involved primarily only with a subsidiary of EFCA, the Equity Funding Life Insurance Company ("EFLIC"). Further, for various reasons delineated in *In re Equity Funding Corp. of Amer. Sec. Litigation*, 416 F.Supp. 161, 191–93 and 199–201 (C.D.Cal. 1976), the MDL Court had previously curtailed the liabilities of defendants Joseph

Froggatt & Co. and Pennsylvania Life Company. In the instance of Joseph Froggatt & Co., which had contributed $3,000,000 to the settlement fund, only claims of securities purchases made after September 11, 1972 were permitted to be maintained in the securities litigation. Moreover, the liability of Joseph Froggatt & Co. arose from its audits of the Banker's National Life Insurance Co. which were not related to the EFCA debentures, but which did affect the 1972 secondary offering of EFCA securities. Similarly, as to Pennsylvania Life Company, which contributed $5,000,000 to the fund, the MDL Court had only permitted claims based on purchases made after December 30, 1971, to continue in the suit.

Thus, the MDL Court had found that the claims of the debentureholders were disputable as to 47 of the nearly 60 million dollar settlement fund (78%).[13] The adoption of the share and share alike provision, which was mandated by the administrative aspects of the situation, would have resulted in the equal participation by the debentureholders in the settlement fund which, in light of the above findings, would have been unfair to the other claimant classes. In order to remedy that inequity, the MDL Court further adopted the offset provision of the Plan of Allocation, including the offset of the Orion stock, with the awareness that the offset would decrease the debentureholders' recovery in the settlement fund more adversely than the other classes. As the MDL Court stated in its Findings of Fact, paragraph 7:

.  .  .  The share-and-share-alike provisions, considered in conjunction with this Court's determination herein that the net adjusted loss of each claimant as calculated under the Plan of Allocation shall be reduced by the amount of cash and the value of Orion common stock received by such claimant in the Chapter X proceedings pursuant to the Amended Plan or pursuant to any agreement or compromise with the Trustee of EFCA and that the value of such Orion common stock is and shall be deemed to be $8.00 per share for such purposes, resolve fairly and equitably complex problems relating to the allocation of proceeds of settlement.

Appellants in their briefs and oral argument before this court have not specifically attacked the pertinent and specific Findings of Fact upon which the MDL Court justified its approval of the offset provision, choosing instead to argue that the offset was not permitted by the bankruptcy and/or federal securities laws. We have rejected the latter arguments, *supra*, and our review of the record generally confirms the MDL Court's Findings of Fact which are relevant to this appeal.[14] After such review and consideration, we find that the MDL Court did not abuse its discretion in approving the Plan of Allocation and adopt-

---

13. If one were to deduct the $10,000,000 primary insurance available to the Wolfson defendants from the $39,000,000 contribution of the settling accountant defendants, the claims of the debentureholders would still be disputed as to 36 out of the 60 million dollars in the settlement fund (60%).

14. We note here that according to paragraph 26 of the MDL Complaint, defendant Seidman & Seidman had allegedly agreed to assume "all the liabilities of Wolfson arising from Wolfson's accounting practice as of that date" as part of the terms of its February 1972 merger with Wolfson. *See In re Equity Funding Corp. of Amer. Sec. Litigation*, 416 F.Supp. 161, 188 (C.D.Cal.1976). Thus, there may have been grounds for the debentureholders to claim against defendant Seidman & Seidman for damages caused by Wolfson. Nevertheless, the debentureholders would not have been entitled to claim against Seidman & Seidman for any of the latter's own alleged negligence. The fact that the settlement from the accountants' group was joint and the sources of the sums not delineated, it would be impossible to separate the $39,000,000 as to the contributions arising from the liability of Seidman & Seidman versus those arising from the acts of the Wolfson defendants.

Further, although the MDL Court found the liability of defendant Haskins & Sells to the debentureholders to be "apparently problematic", it did not precisely state the reasons for that conclusion. Haskins & Sells was saddled with a share of the blame "for the persistence of fraud at Equity Funding" in the Trustee's Report, pp. 143–45.

ing the Plan's offset provision as to both the cash and Orion stock received by the class claimants in the earlier reorganization proceedings.[15]

### III. CONCLUSION

The judgment of the MDL Court is AFFIRMED.

---

15. Appellants did not raise the argument that the reduction which the offset provision produced on the debentureholders' share of the settlement fund was arbitrary because it bore no relation to the degree to which their claims may have been inferior to those of the other claimants. However, we considered the issue in our review of the MDL Court's approval of the Plan of Allocation and did not find the reduction to be so at odds with the relative strength of appellant-debentureholders' claims in comparison with those of the other claimant classes as to render the offset decision an abuse of discretion.