**In re DATA GENERAL CORPORATION ANTITRUST LITIGATION.**

*Data General Corporation v. Ampex Corporation,* N.D. Calif., C.A. No. C79–1002–WHO (D. N.J., C.A. No. 77–0036)

*Data General Corporation v. Data National Corporation,* D. Mass., C.A. No. 78–2869–K

*Data General Corporation v. Ampex Corporation, et al.,* D. Mass., C.A. No. 79–193–T

*Data General Corporation v. Ampex Corporation, et al.,* C.D. Calif., C.A. No. CV79–1342–MRP.

No. 369.

Judicial Panel on Multidistrict Litigation.

Nov. 9, 1979.

Before MURRAY I. GURFEIN, Chairman, and ANDREW A. CAFFREY,* ROY W. HARPER, CHARLES R. WEINER, EDWARD S. NORTHROP, and ROBERT H. SCHNACKE, Judges of the Panel.

## OPINION AND ORDER

PER CURIAM.

### I. BACKGROUND

#### A. Prior Proceedings in This Docket

In May, 1979, the Panel, pursuant to 28 U.S.C. § 1407, centralized six actions in this docket in the Northern District of California for coordinated or consolidated pretrial proceedings before the Honorable William H. Orrick, Jr. *In re Data General Corporation Antitrust Litigation*, 470 F.Supp. 855 (Jud.Pan.Mult.Lit.1979).

Two of these six actions in the transferee district are brought by Data General Corporation (Data General) against Ampex Corporation (Ampex). In one of these actions, Data General is seeking a declaratory judgment against Ampex. Data General states in its complaint that it manufactures minicomputers and microcomputers that are smaller and less expensive forms of general purpose digital computers. Data General markets a line of these small computers under the trademark "NOVA", along with related peripheral devices and related system software.[1] Data General further states that for a NOVA to function as a general purpose digital computer, it must consist of a central processing unit (CPU), main mem-

---

* Judge Caffrey took no part in the decision of this matter.

1. Data General states in its complaint that its software is specially designed as a fundamental set of instructions basic to the operation of Data General's computer for any practical application.

ory (or primary storage),[2] power supply, chassis and operating system software. Data General asserts that the CPU, main memory and operating system software constitute a single product which is commonly referred to as a computer.

Data General seeks a determination in this first action whether: 1) Data General's sale of NOVA minicomputers consisting of a CPU and a minimum amount of main memory constitutes an unlawful tying arrangement in violation of the federal antitrust laws; 2) Data General's licensing practices with respect to NOVA software, including Data General's policy of imposing little or no charge for its software license when a certain minimum amount of Data General computer equipment is purchased and Data General's policy prohibiting use of the licensed software on non-Data General products, constitute an illegal tying arrangement in violation of the federal antitrust laws; 3) Data General's marketing and licensing practices have created, in violation of the federal antitrust laws, an unreasonable restraint of trade in the sale of memory boards and other computer products; and 4) Data General made false and misleading statements about Ampex's financial soundness and integrity to potential purchasers of Ampex's products.

The second action in the transferee district involving Data General and Ampex as parties was also brought by Data General. Data General alleges that Ampex has wrongfully used Data General's memory unit trade secrets which Data General had disclosed to Ampex in order to allow Ampex to manufacture memory units for Data General. More specifically, Data General charges that Ampex unlawfully disclosed the subject matter of Data General's trade secrets to a third party competitor of Data General for the purpose of allowing Ampex and the third party competitor to compete unfairly with Data General. This action (the trade secrets action) is also the first-captioned action on today's opinion and is the action which is the subject of Data General's motion for remand pursuant to 28 U.S.C. § 1407. See *infra* at 1224.

The remaining four actions that were subjects of the Panel's May, 1979 opinion were originally filed in either the Central or Northern District of California (the California actions), and each names Data General as a defendant.

The first of these actions was brought by Digidyne Corporation (Digidyne) against Data General, Data General's president and various unnamed defendants. Digidyne alleges that Data General maliciously and slanderously told Ampex and other Digidyne customers that Digidyne had used trade secrets and proprietary information of Data General in connection with the design and manufacture of a Digidyne computer. Digidyne subsequently amended its complaint to allege that: 1) Data General had illegally tied purchase of its software with purchase of a CPU in violation of the federal antitrust laws; and 2) Data General had attempted to monopolize the business of manufacturing NOVA-compatible computers by means of abuse of copyright laws and licensing agreements and by threats of lawsuits to potential purchasers of NOVA-compatible computers.

The second California action was filed by SCI Systems, Inc. (SCI) against Data General. SCI claims that Data General's practice of licensing its software only for use with NOVA computers, and Data General's practice of intentionally designing and marketing NOVA computers and NOVA software in such manner that it is technologically and financially impracticable for Data General's customers to design their own software, constitute tying arrangements in violation of the federal antitrust laws. SCI also alleges that Data General has engaged in a systematic program of harassing manufacturers of NOVA-compatible computers for the purpose of restraining competition by bringing groundless actions against oth-

---

**2.** Data General explains in its complaint that main memory (which consists of one or more memory boards composed of electromagnetic and/or electronic components mounted on a printed circuit) stores the operating system, as well as the application programs and data actually being processed by the CPU, during the data processing cycle.

er manufacturers, including SCI, for misappropriating trade secrets and breaching and inducing breach of Data General licenses. Finally, SCI charges that Data General, in acquiring the assets of another computer manufacturer, has monopolized or attempted to monopolize the NOVA-compatible computer market.

The third California action was filed by Fairchild Camera and Instrument Corporation (Fairchild) against Data General. Fairchild alleges that Data General's software licensing agreements constitute illegal tying arrangements under the federal antitrust laws, and that Data General has attempted to eliminate competition from Fairchild and other manufacturers in the market for NOVA-compatible computers by means of abuse of copyright laws and licensing agreements and by litigation and threats of litigation to manufacturers of NOVA-compatible computers and their potential customers.[3]

The fourth California action was brought by Bytronix Corporation (Bytronix) against Data General. Bytronix alleges that 1) Data General has restrained competition in the market for minicomputer CPUs by asserting that manufacturers of NOVA-compatible CPUs are violating Data General's trade secrets; 2) Data General's software licensing agreements constitute illegal tying arrangements under the federal antitrust laws; 3) Data General's marketing policies and practices have unreasonably restrained trade in the sale of CPUs; and 4) Data General is violating the California Business and Professions Code by greatly reducing the price of its software licenses to purchasers of its other equipment and by providing less than adequate service of equipment Data General sells if that equipment is used in connection with equipment sold by Data General's competitors.

Subsequent to the Panel's May, 1979 opinion, a seventh action, brought by Data Compass Corporation (Data Compass) against Data General, was transferred to the Northern District of California pursuant to a conditional transfer order entered by the Panel that became final on June 8, 1979. Data Compass alleges that Data General engaged in illegal tying arrangements and that Data General breached a computer purchase contract between the parties.

Judge Orrick has adopted a bifurcated approach to the actions before him in the transferee district. Discovery and trial have been scheduled to occur first on the antitrust tie-in issues present in the actions, to be followed by discovery and trial of the remaining issues.

### B. Description of Actions Outside of the Transferee District

The second above-captioned action (*Data National*) was filed in the District of Massachusetts by Data General against Data National Corporation (Data National). Data General in its complaint states that it sells its products to two kinds of purchasers: Original Equipment Manufacturers (OEMs) and Endusers.[4] Data General also states that OEMs receive discounts from Data General that are ten percent greater than discounts granted to Endusers. Data General alleges that Data National 1) failed to pay invoices when due; 2) forfeited discounts based on Data National's representations that it was an OEM and would purchase a certain minimum quantity of Data General products; 3) failed to pay previously agreed upon cancellation charges imposed upon the cancellation of purchase or-

---

**3.** Subsequent to centralization of the *Fairchild* and *SCI* actions by the Panel, Data General filed counterclaims against Fairchild and SCI alleging misappropriation of trade secrets in connection with the development by Fairchild and SCI of CPUs that were said to be compatible with Data General's NOVA computers.

**4.** Data General explains that an OEM is an intermediate purchaser who purchases Data

General's equipment for resale after incorporating the equipment into a system which includes substantial hardware and/or software developed or manufactured by the purchaser and which represents a significant enhancement and transformation of the equipment purchased from Data General, both as to value and function. An Enduser is any purchaser other than an OEM.

ders submitted to Data General by Data National; 4) failed to pay for certain field engineering services rendered by Data General; 5) falsely and fraudulently represented to Data General that Data National was in compliance with Data General's OEM certifications in order to induce Data General to enter into an OEM agreement with Data National; and 6) committed unfair trade practices by falsely representing and continuing to represent to third parties that Data National was a Data General OEM.

In Data National's counterclaim, Data National alleges that Data General breached its sales contract with Data National and that Data General induced Data National's customers to breach their contracts with Data National. Data National also alleges that Data General violated federal antitrust laws by 1) requiring, in restraint of trade, the addition of substantial hardware and/or software developed or manufactured by Data National before Data National would be allowed to sell Data General's equipment; 2) forcing Data National and others to sell Data General's equipment at prices specified by Data General; 3) engaging in price discrimination among purchasers; and 4) attempting to monopolize the sale of all of Data General's equipment "which is only furnished to [Data National] and others pursuant to agreements whereby the buyer is forced to certify that it will enhance [Data General's] equipment by the addition of other substantial equipment before sale."

The third above-captioned action (*Ampex I*) was filed in the District of Massachusetts by Data General against Data National and Ampex. Data General alleges that Ampex and Data National are infringing United States Letters Patent No. 4,014,006 entitled "Data Processing System Having a Unique CPU and Memory Timing Relationship and Data Path Configuration." Ampex is alleged to have made and used, and to have induced others to make, sell and use, data processing systems, including memory devices, which embody the invention of Patent No. 4,014,006. Data General also alleges that Ampex, alone, has 1) wrongfully misappropriated Data General's proprietary information; 2) unfairly com-

peted with Data General; 3) breached Ampex's contract with Data General; 4) infringed upon Data General's common law copyrights; 5) been unjustly enriched at Data General's expense; and 6) engaged in deliberate and wilful tortious conduct.

The fourth above-captioned action (*Ampex II*) is brought by Ampex and Data National against Data General and Concept Development, Inc. (CDI) in the Central District of California. Plaintiffs allege that Ampex entered into a contract with CDI whereby CDI promised to design and deliver a memory unit that would operate compatibly with Data General's NOVA 2 CPU, and that CDI agreed to indemnify Ampex against all claims of interest by third parties in or to the designs furnished by CDI to Ampex. Plaintiffs further allege that Ampex sold one memory unit to Data National incorporating the CDI designs, which is currently the subject of litigation in *Ampex I*. Plaintiffs seek a declaration that Letters Patent No. 4,014,006 is void or not infringed by them and a further declaration that Ampex has not engaged in the illegal conduct alleged by Data General in *Ampex I*. Plaintiffs also seek indemnification from CDI for any wrongful conduct that plaintiffs may be adjudged to have committed.

## II. *PROCEEDINGS BEFORE THE PANEL*

Because *Data National, Ampex I* and *Ampex II* appeared to involve common questions of fact with the actions in this docket previously transferred to the Northern District of California, the Panel, pursuant to 28 U.S.C. § 1407 and Rule 9, R.P.J.P. M.L., 78 F.R.D. 561, 567–68 (1978), entered an order conditionally transferring the three actions to the Northern District of California for inclusion in the coordinated or consolidated pretrial proceedings occurring there. Data National and Ampex support transfer. Data General opposes transfer.

Data General moves the Panel, pursuant to 28 U.S.C. § 1407, for an order remanding the trade secrets action to its transferor

district. Ampex opposes remand at this time.

### III. HOLDING

We find that *Data National, Ampex I* and *Ampex II* share questions of fact with the previously transferred actions and that transfer of the three actions to the Northern District of California pursuant to Section 1407 will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. We further find that remand of the trade secrets action is not appropriate at this time.

### IV. REASONING

#### A. *Ampex I, Ampex II, and the Trade Secrets Action*

Although Data General concedes that these three actions share questions of fact regarding computer technology with all actions in the transferee district, Data General contends that, as a result of Judge Orrick's rulings that the antitrust tie-in claims in the actions in the transferee district will proceed through discovery and trial independent of trade secret and other claims, the benefits, if any, of transfer of *Ampex I* and *Ampex II* to the transferee district and retention of the trade secrets action there would be minimal and the resulting delay and prejudice to Data General would be great. Data General asserts that Ampex's support for transfer of *Ampex I* and *Ampex II* and Ampex's opposition to remand of the trade secrets action evidences Ampex's intention to engage in forum shopping and to bring all proceedings involving claims of Data General to a standstill.

Data General further urges that *Ampex I* and *Ampex II*, involving a specific patent, specific conduct of Ampex and CDI, and specific memory devices not manufactured by Data General, will have little in common with the discovery presently being conducted in the transferee district that has gone into entire markets, entire computer systems and entire product lines, and that has focused completely on antitrust, rather than patent, issues. Data General also contends

that the remaining discovery in the trade secrets action is likewise substantially unrelated to the antitrust discovery occurring in the transferee district.

■ We find these arguments unpersuasive. Data General, itself, has in pleadings before the transferee court delineated the following relationships between the trade secret claims and the antitrust tie-in claims pending there:

> The trade secret issues here involve theft of complex designs and intellectual property in a highly sophisticated industry where physical dissimilarities between the original and copied product make it difficult to prove or disprove a theft case simply by looking at the two items. Among other things, proof of trade secret claims here will involve the technology of the hardware-software interface, the time taken to develop a particular product, the extent to which "glitches" or failures in the original and copied hardware arise under similar operational circumstances, and so forth. As explained below, these technology issues also arise in the tie-in case. We submit that the court's analysis of the relationship between the tie issues and the trade secret issues will be helped by considering the problem as one of the relationship between the tie issues and *technology* issues.

Memorandum of Data General Corporation In Opposition to Plaintiffs' Motion for Entry of a Pretrial Order Limiting the November Trial and Staying Discovery at 3. (emphasis in original). We stress that Data General was discussing not only its claims against Ampex in the trade secrets action, but also Data General's counterclaims alleging misappropriation of trade secrets against plaintiffs in two other actions in the transferee district.

At oral argument before the Panel, Ampex went to great lengths to cogently demonstrate to the Panel that the same complex computer technology involved in the actions now in the transferee district also provides the underpinning for *Ampex I* and

*Ampex II*, regardless of the fact that these two actions involve legal theories not yet present in the transferee district. In particular, Ampex has persuaded us that the actions in the transferee district and *Ampex I* and *Ampex II* all involve intertwined factual questions relating to prior art and development of the same computer technology and how that technology pertains to Data General's marketing practices.

Thus, transfer of *Ampex I* and *Ampex II* and retention of the trade secrets action in the transferee district will contribute to the expeditious resolution of the related antitrust and proprietary right claims involving Data General's minicomputer products by placing the entire controversy before a single judge conversant with the complex computer technology underlying the claims in all actions and by fostering orderly pretrial proceedings on those common issues.

 The adoption of a bifurcated pretrial schedule by Judge Orrick does nothing to render the continued centralization of all actions before Judge Orrick inappropriate.[5] As we noted in our original opinion in this litigation, and have repeatedly emphasized throughout the Panel's history, Section 1407 contemplates that the degree and manner of coordinated or consolidated pretrial proceedings is left entirely to the discretion of the trial judge. *See, e. g., In re Data General Corporation Antitrust Litigation,* supra, 470 F.Supp. at 859; *In re Equity Funding Corporation of America Securities Litigation*, 375 F.Supp. 1378, 1384 (Jud.Pan. Mult.Lit.1974). The transferee judge, as the firsthand judicial observer, is obviously in the best position to determine the desirability of a bifurcated method of pretrial proceedings. We note that, as Data General admits, the bifurcated proceedings in the transferee district will not result in a halt to all relevant proceedings with respect to trade secret claims, for technological discovery that is undertaken on the antitrust tie-in claims and that is also related to the

trade secret claims will, perforce, be occurring concurrently. This reasoning similarly applies to *Ampex I* and *Ampex II.*

 Furthermore, we note that Data General has already requested Judge Orrick to recommend to the Panel remand of the trade secrets action, and Judge Orrick, in a ruling from the bench on July 18, 1979, has denied that request. The following quotation from an earlier Panel opinion is apposite to the proceedings before us:

> In considering the question of remand, the Panel has consistently given great weight to the transferee judge's determination that remand of a particular action at a particular time is appropriate because the transferee judge, after all, supervises the day-to-day pretrial proceedings. *See, e. g., In re IBM Peripheral EDP Devices Antitrust Litigation*, 407 F.Supp. 254, 256 (Jud.Pan.Mult.Lit.1976). The transferee judge's notice of suggestion of remand to the Panel is obviously an indication that he perceives his role under Section 1407 to have ended. *In re Air Crash Disaster Near Dayton, Ohio, on March 9, 1967*, 386 F.Supp. 908, 909 (Jud. Pan.Mult.Lit.1975). Absent a notice of suggestion of remand from the transferee judge to the Panel, any party advocating remand before the Panel bears a strong burden of persuasion. We rule that movants have not met this burden here and that the motion for remand is premature. [The transferee judge] has become thoroughly familiar with the issues in this entire litigation and is in the best position to determine the future course of [each action in this docket].

Plaintiffs' apparent dissatisfaction with some of [the transferee judge's] pretrial rulings is clearly not a factor to be taken into consideration by the Panel in exercising its discretion under Section 1407. The Panel has neither the statutory authority nor the inclination to review decisions of district courts, whether they are

---

5. For a discussion on the use of separate trials of separate issues as a means of securing a more orderly presentation of evidence or a better understanding of the evidence in relation to

the particular issue or issues under consideration by the trier of fact, see *Manual for Complex Litigation*, Part I, § 4.12 (rev. ed. 1977).

transferor or transferee courts. *See In re Molinaro/Catanzaro Patent Litigation*, 402 F.Supp. 1404, 1406 (Jud.Pan.Mult.Lit. 1975); *In re Glenn W. Turner Enterprises Litigation*, 368 F.Supp. 805, 806 (Jud.Pan. Mult.Lit.1973).

*In re Holiday Magic Securities and Antitrust Litigation*, 433 F.Supp. 1125, 1126 (Jud.Pan.Mult.Lit.1977). We emphasize that if and when any action or claim in this docket is, in fact, ready for trial or otherwise ready for remand because the transferee judge finds that Section 1407 proceedings pertaining to that action or claim are completed, the transferee judge may suggest to the Panel that the Panel remand the action or claim to its transferor court. 28 U.S.C. § 1407(a); Rule 11(c)(ii), R.P.J.P. M.L., 78 F.R.D. 561, 569 (1978). *See, e. g., In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation*, 453 F.Supp. 108 (Jud.Pan.Mult.Lit.1978).

### B. *Data National*

Data General asserts that *Data National* primarily involves claims for breach of contract and does not share sufficient questions of fact with the actions in the transferee district to warrant transfer. Furthermore, Data General contends, the antitrust claims in *Data National* are unrelated to the antitrust claims in the transferee district because in none of the actions in the transferee district is a non-Data General party a purchaser of Data General products under an OEM contract. Data General urges that the actions in the transferee district involve allegedly anti-competitive practices in sales to ultimate users of computer equipment, whereas *Data National* involves alleged restraints and price discrimination in Data General's distribution system to OEMs. Accordingly, Data General stresses that while the claims in *Data National* and the actions in the transferee district may be based on violations of the antitrust laws, the factual issues are dissimilar and would not benefit from Section 1407 proceedings. Data General also contends that transfer of *Data National* should be denied because a proper interpretation of Massachusetts contract law is essential to resolution of the antitrust claims in *Data National*, and this can best be accomplished by a Massachusetts federal judge familiar with Massachusetts law. Finally, Data General notes that a motion to dismiss Data General's fraud claims in *Data National* is pending in the Massachusetts court, and Data General therefore suggests that transfer of *Data National* would be inappropriate prior to resolution of that motion.

■ We find that *Data National* should also be included in the centralized proceedings before Judge Orrick. We are persuaded that in both the actions in the transferee district and in *Data National* substantial overlapping discovery will be required regarding Data General's marketing practices, Data General's economic power, computer technology, and the computer market in general. This commonality is underscored by Data National's assertion that Data General's illegal practices in the OEM market have enabled Data General to exercise its monopoly power in the Enduser market. Transfer of Data National is therefore necessary in order to avoid duplicative discovery and prevent waste of resources by the parties, their counsel and the courts.

■ We see no reason to delay transfer because of the pendency of a motion to dismiss in *Data National*. This motion can be presented to and decided by the transferee judge following transfer. *See In re Commonwealth Oil/Tesoro Petroleum Securities Litigation*, 458 F.Supp. 225, 230 (Jud. Pan.Mult.Lit.1978). The fact that the transferee court may have occasion to apply Massachusetts law also serves as no impediment to transfer of *Data National*. As we stated in *In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 407 F.Supp. 244 (Jud.Pan.Mult.Lit. 1976):

> [I]t is within the very nature of coordinated or consolidated pretrial proceedings in multidistrict litigation for the transferee judge to be called upon to apply the law of more than one state. *See, e. g., In re Air Crash Disaster at Boston, Massachusetts, on July 31, 1973*, 399 F.Supp.

1106 (D.Mass.1975). Thus, [all parties] can be assured that [the law of the transferor district], as well as any other state's law, if appropriate, will be duly applied by the transferee judge.

*Id.* at 246–47.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions entitled *Data General Corporation v. Data National Corporation*, D. Massachusetts, C.A. No. 78–2869–K, *Data General Corporation v. Ampex Corporation, et al.*, D. Massachusetts, C.A. No. 79–193–T, and *Ampex Corporation, et al. v. Data General Corporation, et al.*, C.D. California, C.A. No. CV79–1342–MRP, be, and the same hereby are, transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable William H. Orrick, Jr., for inclusion in the coordinated or consolidated pretrial proceedings occurring there.

IT IS FURTHER ORDERED that the motion pursuant to 28 U.S.C. § 1407(a) for remand of the action entitled *Data General Corporation v. Ampex Corporation*, N.D. California, C.A. No. C79–1002–WHO (D. New Jersey, C.A. No. 77–0036), be, and the same hereby is, DENIED.